37 A.3d 1089

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. FRENSEL GAITAN, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. ROHAN GOULBOURNE, DEFENDANT–RESPONDENT.

Argued November 9, 2011—Decided February 28, 2012.

Albin, J., filed a dissenting opinion, with which Long, J., joined.

342

344

*Frank J. Ducoat,* Deputy Attorney General, argued the cause for appellant State of New Jersey (*Paula T. Dow,* Attorney General, attorney).

*Carol M. Henderson,* Assistant Attorney General, argued the cause for appellant State of New Jersey (*Paula T. Dow,* Attorney General, attorney).

*Mark H. Friedman,* Assistant Deputy Public Defender, argued the cause for respondent Frensel Gaitan (*Joseph E. Krakora,* Public Defender, attorney).

*Christopher T. Howell* argued the cause for respondent Rohan Goulbourne.

*Jeffrey S. Mandel* argued the cause for amici curiae Association of Criminal Defense Lawyers of New Jersey and American Civil Liberties Union of New Jersey (*PinilisHalpern,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

These companion appeals arose out of defendants' petitions for post-conviction relief (PCR). In both cases, defendants were lawful permanent residents who were indicted for drug offenses and entered guilty pleas. The guilty pleas rendered both defendants removable[1] under the Immigration and Nationality Act (INA), 8 *U.S.C.A.* § 1227(a)(2). Each alleges that he received ineffective assistance of counsel contrary to the standards set forth in *State v. Nuñez–Valdéz,* 200 *N.J.* 129, 975 *A.*2d 418 (2009),

[1] Over the past century, amendments to federal immigration statutes changed the terminology used in that area of law. "Removal" is the current statutory term used for what was known in the past as "deportation." *See Padilla v. Kentucky,* 559 *U.S.* ——, ——, 130 *S.Ct.* 1473, 1480 n. 6, 176 *L.Ed.*2d 284, 292 n. 6. For purposes of this opinion, we use the current statutory language of removal.

and *Padilla v. Kentucky*, 559 *U.S.* ——, 130 *S.Ct.* 1473, 176 *L.Ed.*2d 284 (2010), because his attorney provided either no or incomplete information about the immigration consequences of a guilty plea, rendering the advice false and misleading.

In *Nuñez–Valdéz, supra*, we agreed that defendant demonstrated that he received ineffective assistance of counsel under Sixth Amendment standards when initial counsel had provided false advice assuring that deportation would not flow from defendant's guilty plea, and substituted counsel augmented that with affirmatively misleading information concerning the deportation consequences of defendant's plea of guilty, a matter that was of material interest to defendant at the time of his plea. 200 *N.J.* at 140–42, 975 *A.*2d 418. The United States Supreme Court went further in *Padilla, supra*, holding that defense attorneys now must advise their clients of potential immigration consequences of pleading guilty or risk providing constitutionally deficient assistance of counsel. 559 *U.S.* at ——, 130 *S.Ct.* at 1484, 176 *L.Ed.*2d at 297. That standard for effective assistance of counsel was not fixed, for constitutional purposes, prior to *Padilla*.

The present appeals squarely raise the question of the retroactive application of the broader *Padilla* holding. Because of the shared issue of *Padilla's* retroactivity, we consolidated these appeals.

I.

A.

To anchor our analysis of the legal question raised by defendants, we begin with a brief summary of the circumstances giving rise to their PCR petitions. Additional factual detail is provided hereinafter.

On November 16, 2004, defendant Frensel Gaitan was indicted in Camden County for third-degree possession of a controlled dangerous substance (CDS), *N.J.S.A.* 2C:35–10(a)(1); third-degree distribution of a CDS to a minor, *N.J.S.A.* 2C:35–5(a)(1), (b)(3),

and *N.J.S.A.* 2C:35–8; and distribution of a CDS within one thousand feet of a school, *N.J.S.A.* 2C:35–7. He pled guilty to the charge of third-degree distribution of a CDS within one thousand feet of a school on June 27, 2005, and was sentenced on October 7, 2005, to five years' probation. Gaitan did not file a direct appeal.

In 2008, based on the drug conviction, which constitutes an aggravated felony, a removable offense under the INA, *see 8 U.S.C.A.* §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii), Gaitan was removed. He thereafter filed a PCR petition on May 28, 2008, alleging ineffective assistance of counsel. Although Gaitan had responded "yes" to Question 17 on the plea form, which asked "Do you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty," he asserted that counsel failed to warn him that his plea carried with it potential immigration consequences. That failure, according to Gaitan, constituted ineffective assistance of counsel. The PCR court denied defendant's petition on March 20, 2009, finding that defendant's affirmative answer to Question 17 implied that he was aware of his plea's possible impact on his immigration status.

The Appellate Division reversed, concluding that defense counsel's failure to provide advice on the possibility of deportation constituted attorney deficiency for the purposes of Gaitan's ineffective assistance of counsel claim. *State v. Gaitan,* 419 *N.J.Super.* 365, 369–70, 17 *A.*3d 227 (App.Div.2011). The panel held that, regardless of whether that standard of attorney deficiency constituted a new rule, Gaitan was entitled to a remand for an evidentiary hearing on his claim. *Id.* at 373–74, 17 *A.*3d 227.

The State then filed a petition for certification, which was granted. *State v. Gaitan,* 206 *N.J.* 330, 20 *A.*3d 436 (2011).

### B.

Defendant Rohan Goulbourne was arrested in Paterson in July 2007 and indicted by a Passaic County Grand Jury on charges of fourth-degree possession of a CDS, *N.J.S.A.* 2C:35–10(a)(3); two counts of fourth-degree distribution of a CDS, *N.J.S.A.* 2C:35–

5(a)(1) and (b)(12); two counts of third-degree distribution of a CDS within five hundred feet of a public building, *N.J.S.A.* 2C:35–7.1(a) and *N.J.S.A.* 2C:35–5(a); two counts of third-degree distribution of a CDS within one thousand feet of a school, *N.J.S.A.* 2C:35–7 and *N.J.S.A.* 2C:35–5(a); third-degree possession of a CDS with intent to distribute, *N.J.S.A.* 2C:35–5(a)(1) and (b)(11); third-degree possession of a CDS with intent to distribute within one thousand feet of a school, *N.J.S.A.* 2C:35–7 and *N.J.S.A.* 2C:35–5(a); second-degree possession of a CDS with intent to distribute within five hundred feet of a public building, *N.J.S.A.* 2C:35–7.1(a) and *N.J.S.A.* 2C:35–5(a); and fourth-degree resisting arrest, *N.J.S.A.* 2C:29–2(a)(2).

Following negotiations between the prosecutor and the public defender, Goulbourne agreed to plead guilty to one count of possession of a CDS with intent to distribute within one thousand feet of a school. The prosecutor, in return, recommended a sentence of three years' imprisonment with a fifteen-month period of parole ineligibility. At a March 2008 plea hearing, both defense counsel and the court informed Goulbourne that he "may very well" be deported as a result of the plea. The court also noted that Goulbourne answered all the questions on the plea form, which included Question 17, and that he signed the form after reviewing it with his attorney. Satisfied that Goulbourne knowingly and voluntarily was pleading guilty, the court accepted the plea. The court imposed the recommended sentence, and Goulbourne did not appeal.

Pursuant to the INA, on July 11, 2008, Goulbourne was charged with removal based on his conviction for a CDS offense, which qualified as an aggravated felony. 8 *U.S.C.A.* §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii). He was paroled to U.S. Immigration and Customs Enforcement on May 11, 2009.[2] Goulbourne filed a PCR

---

[2] Pursuant to 8 *U.S.C.A.* § 1226, the federal government is authorized to take into custody and, pending a final decision on whether they are to be removed, detain noncitizens who have committed crimes subjecting them to removal.

petition in September 2009, alleging that his counsel was ineffective for failing to explain that he would be deported if he pled guilty and for neglecting to advise him of his right to speak with an immigration attorney. The PCR court conducted an evidentiary hearing on April 8, 2010. After reviewing the testimony, the PCR court determined that, although Goulbourne appeared to be focused during his plea hearing on how much jail time he would be required to serve, the PCR court would give Goulbourne "the benefit of the doubt" that he would not have pled guilty had he been better advised of the certainty of deportation and, specifically, of his right to consult an immigration attorney. Accordingly, finding that the advice rendered to Goulbourne was "incomplete," the PCR court granted the PCR petition and allowed Goulbourne to withdraw his plea. The Appellate Division affirmed in an unpublished opinion.

The Attorney General superseded the Passaic County Prosecutor's Office and moved for leave to appeal. We granted the motion, *State v. Goulbourne*, 207 *N.J.* 226, 23 *A.*3d 933 (2011), and consolidated the appeal with the appeal in *State v. Gaitan*.

## II.

### A.

The Sixth Amendment of the United States Constitution and the New Jersey Constitution guarantee criminal defendants the right to counsel, which right requires that defendants receive "the effective assistance of counsel." *Strickland v. Washington*, 466 *U.S.* 668, 686, 104 *S.Ct.* 2052, 2063, 80 *L.Ed.*2d 674, 692 (1984) (quoting *McMann v. Richardson*, 397 *U.S.* 759, 771 n. 14, 90 *S.Ct.* 1441, 1449 n. 14, 25 *L.Ed.*2d 763, 773 n. 14 (1970)); *see State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting *Strickland* standard for ineffective assistance of counsel claims under Article I, Paragraph 10 of New Jersey Constitution). To establish a claim for ineffective assistance of counsel, a defendant must show deficient performance by counsel "so serious that counsel was not

functioning as the 'counsel' guaranteed by the Sixth Amendment" and that the defendant was prejudiced by the attorney's performance. *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693; *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336; *see also R.* 3:22–1, –2 (establishing right to petition for post-conviction relief and setting forth grounds for relief, which include federal and state constitutional bases for ineffective assistance of counsel claims).

The right to counsel guarantees defendants the right "to competent counsel." *State v. DiFrisco,* 174 *N.J.* 195, 220, 804 *A.*2d 507 (2002). Attorneys are held to a standard of "reasonableness under prevailing professional norms." *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. Deficient performance is established by proving that "counsel's acts or omissions fell 'outside the wide range of professionally competent assistance' considered in light of all the circumstances of the case." *State v. Castagna,* 187 *N.J.* 293, 314, 901 *A.*2d 363 (2006) (quoting *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). And, the evaluation as to the reasonableness of an attorney's performance must be " 'viewed as of the time of counsel's conduct.' " *Ibid.* (quoting *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 694). Although a demonstration of prejudice constitutes the second part of the *Strickland* analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, *see Strickland, supra,* 466 *U.S.* at 697, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient. *Ibid.* With respect to both prongs of the *Strickland* test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence. *See State v. Echols,* 199 *N.J.* 344, 357, 972 *A.*2d 1091 (2009); *State v. Goodwin,* 173 *N.J.* 583, 593, 803 *A.*2d 102 (2002).

It is well established that the *Strickland* standard applies with equal force to assertions of ineffective assistance of

counsel associated with the entry of guilty pleas as to trial derelictions. *See Hill v. Lockhart*, 474 *U.S.* 52, 57, 106 *S.Ct.* 366, 369–70, 88 *L.Ed.*2d 203, 209 (1985). In the specific context of showing prejudice after having entered a guilty plea, a defendant must prove " 'that there is a reasonable probability that, but for counsel's errors, [he or she] would not have pled guilty and would have insisted on going to trial.' " *Nuñez–Valdéz, supra,* 200 *N.J.* at 139, 975 *A.2d* 418 (quoting *DiFrisco, supra,* 137 *N.J.* at 457, 645 *A.2d* 734).

With those general standards in mind, we turn to the two critical cases concerning ineffective assistance of counsel claims in which immigration consequences followed the entry of a guilty plea. We begin first with our 2009 *Nuñez–Valdéz* decision.

## B.

In *Nuñez–Valdéz, supra,* this Court held that when counsel provides false or affirmatively misleading advice about the deportation consequences of a guilty plea, and the defendant demonstrates that he would not have pled guilty if he had been provided with accurate information, an ineffective assistance of counsel claim has been established. 200 *N.J.* at 131, 975 *A.2d* 418. In 1987, in the context of passing on a claim of inadequate warning from a court accepting a plea as knowing and voluntary, this Court had expressed the view that there was no requirement to warn a pleading noncitizen client that his or her plea would result in certain collateral consequences. *See State v. Heitzman,* 107 *N.J.* 603, 604, 527 *A.2d* 439 (1987) (holding that defendant need only be warned of penal consequences, and not collateral consequences, of criminal pleas). We specifically noted that immigration ramifications are within the "collateral" designation. *See ibid.* That said, our case law nevertheless reflected an abiding concern about affirmative misinformation from counsel to a pleading client that could undercut a knowing and voluntary plea. *See, e.g., State v. Bellamy,* 178 *N.J.* 127, 142, 835 *A.2d* 1231 (2003); *State v. Howard,* 110 *N.J.* 113, 125, 539 *A.2d* 1203 (1988). That concern about the repercussions from affirmative misinformation

included the serious ramifications that could flow from a plea in respect of a defendant's immigration status. Thus, prior to *Nuñez–Valdéz*, it was hardly revolutionary under New Jersey law that an attorney could not actually give wrong or inaccurate information about immigration consequences of a guilty plea without risking an assertion of having provided ineffective assistance. *See State v. Chung*, 210 *N.J.Super.* 427, 434–35, 510 *A.*2d 72 (App.Div.1986) (addressing *Strickland's* deficiency prong in connection with counsel's advice on immigration consequences of plea, but finding no ineffective assistance of counsel due to absence of any actual misrepresentation by defense counsel); *see also State v. Garcia*, 320 *N.J.Super.* 332, 339–40, 727 *A.*2d 97 (App.Div.1999) (noting that misinforming client can result in ineffective assistance that would support vacation of guilty plea, and remanding for evidentiary hearing to review claim that client was affirmatively misinformed about deportation consequence when guilty plea was entered).[3] *Nuñez–Valdéz, supra,* applied that principle in its holding.

In *Nuñez–Valdéz,* defendant Jose Nuñez–Valdéz pled guilty to fourth-degree criminal sexual contact, an offense that was equivalent to an aggravated felony carrying the consequence of mandatory deportation. 200 *N.J.* at 140, 975 *A.*2d 418. It was undisputed in the record before the PCR court that Nuñez–Valdéz's first attorney, Aaron Smith, mistakenly advised him that a guilty plea would not have any immigration consequences. *Id.* at 132, 140, 975 *A.*2d 418. Nuñez–Valdéz later obtained substitute counsel, Troy Archie, who testified that he told defendant that deportation was a "possibility," *id.* at 133–34, 975 *A.*2d 418; however, Nuñez–Valdéz testified otherwise, stating that Archie, like the first attorney, told him the plea would have no immigration consequences, *id.* at 133, 975 *A.*2d 418.

---

3 Research also discloses one previous Law Division case going further, and granting post-conviction relief based on insufficient advice about immigration consequences. *See State v. Vieira*, 334 *N.J.Super.* 681, 688, 760 *A.*2d 840 (Law Div.2000) (granting post-conviction relief and allowing plea withdrawal due to counsel's failure to address deportation issue with resident alien defendant).

The PCR court found that Nuñez–Valdéz established deficient performance because Smith erroneously told him he would not be deported and Archie's later augmentation to that previous misadvice—that deportation was a possibility—was inexact and misleading to Nuñez–Valdéz because deportation was mandatory and, therefore, a certain consequence. *Id.* at 135, 975 *A.*2d 418. The PCR court accepted that Nuñez–Valdéz would have proceeded to trial had he known that a guilty plea would result in mandatory deportation, *id.* at 141, 975 *A.*2d 418, and therefore found that he had demonstrated that he was prejudiced, *id.* at 143, 975 *A.*2d 418.

The Appellate Division was of the view that the PCR court's factual findings were clearly mistaken and reversed the grant of PCR to Nuñez–Valdéz. *Id.* at 135, 975 *A.*2d 418. We granted certification and reversed the Appellate Division's judgment, concluding that sufficient credible evidence supported the PCR court's findings. *Id.* at 131, 975 *A.*2d 418. Giving typical deference due the findings of the PCR court, we held that Nuñez–Valdéz was misinformed by counsel about the deportation consequences of his plea, *id.* at 141–42, 975 *A.*2d 418, and that such misinformation satisfied the first prong of the *Strickland* test, *id.* at 140–42, 975 *A.*2d 418; and again giving due deference to the PCR court, we further affirmed the PCR court's finding that Nuñez–Valdéz would not have pled guilty if his attorneys had not materially misadvised him about the immigration consequences of his plea, *id.* at 142–43, 975 *A.*2d 418.

Because our holding was rooted in the belief in New Jersey law that it is "ineffective assistance of counsel to provide misleading, material information that results in an uninformed plea," it was irrelevant to our determination whether immigration consequences were regarded as "penal" or "collateral." *Id.* at 139–40, 975 *A.*2d 418.[4] To the extent that the then-pending decision of the United

---

[4] Although the penal-versus-collateral dichotomy sharply separated the parties and amici in *Nunez–Valdez, see id.* at 136–37, 139 n. 2, 975 *A.*2d 418, in actuality,

States Supreme Court in *Padilla* might involve that distinction, we elected to base our determination on state constitutional grounds. *Ibid.* Thus, our holding established that under the state constitutional right to counsel, an ineffective assistance of counsel claim could be based on the provision of false and affirmatively misleading advice about a plea to an offense that constituted an aggravated felony under federal immigration law that therefore would trigger mandatory deportation. *Ibid.*

We thus turn to the ground covered by the *Padilla* holding.

## C.

The United States Supreme Court issued its decision in *Padilla* in 2010. In reversing the Kentucky Supreme Court's denial of post-conviction relief to Jose Padilla, a Honduran citizen who faced automatic deportation after forty years as a lawful United States resident because he pled guilty to a drug offense, the Supreme Court agreed with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation. *Padilla, supra,* 559 U.S. at ——, 130 *S.Ct.* at 1478, 176 *L.Ed.*2d at 290.[5]

Notably, the Court rejected application of a direct-versus-collateral consequences analysis to the issue at hand, pointing out that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally reasonable

---

all involved were equally concerned about how to ensure that a knowing guilty plea is entered by a noncitizen defendant. *Id.* at 136–37, 975 *A.*2d 418. Accordingly, significant attention was directed at the adequacy of the current plea form, which had only recently been amended, and the Court concluded that further refinement was required. *Id.* at 143–44, 975 *A.*2d 418.

[5] The Kentucky Supreme Court denied PCR without the benefit of an evidentiary hearing based on the view that counsel's failure to advise Padilla of the collateral immigration consequences of his plea was not a basis for PCR. Due to that posture of the case, the Supreme Court did not address whether Padilla had demonstrated prejudice as required by the second prong of *Strickland's* analysis. *Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1487, 176 *L.Ed.*2d at 299.

professional assistance required under *Strickland*." *Id.* at ——, 130 *S.Ct.* at 1481, 176 *L.Ed.*2d at 293 (quotation marks omitted). Moreover, because of the "unique nature of deportation," the Court found it unnecessary to consider whether a distinction between direct and collateral consequences is even appropriate for purposes of the *Strickland* analysis. *Id.* at ——, 130 *S.Ct.* at 1481, 176 *L.Ed.*2d at 293.[6] Rather, the Court determined the distinction to be "ill-suited" to the task of evaluating a *Strickland* claim bottomed on the risk of deportation attendant to a guilty plea. *Id.* at ——, 130 *S.Ct.* at 1482, 176 *L.Ed.*2d at 294. Recognizing that deportation is a "particularly severe 'penalty' . . . intimately related to the criminal process," *id.* at ——, 130 *S.Ct.* at 1481, 176 *L.Ed.*2d at 293, the Court reviewed the significance of "recent changes in our immigration law [that] have made removal nearly an automatic result for a broad class of noncitizen offenders," *id.* at ——, 130 *S.Ct.* at 1481, 176 *L.Ed.*2d at 294. Against that backdrop, the Court declared that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." *Id.* at ——, 130 *S.Ct.* at 1482, 176 *L.Ed.*2d at 294. The Court thus engaged in a *Strickland* analysis in light of that pronouncement.

After reviewing the general scope of reasonable assistance of counsel, the Court found that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Ibid.* In support of that finding, Justice Stevens, writing for the Court, observed that "authorities of every stripe—including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications—universally require defense attorneys to advise as to the risk of deportation

---

[6] That said, the Court expressed awareness of the dichotomy's use in analyzing ineffective assistance claims, noting that the Kentucky Supreme Court was "not alone" in finding the distinction meaningful when determining whether the failure to advise on a collateral consequence is cognizable as an ineffective assistance of counsel claim. *Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1481, 176 *L.Ed.*2d at 293.

consequences for non-citizen clients." *Id.* at ——, 130 *S.Ct.* at 1482, 176 *L.Ed.*2d at 295 (citation and quotation marks omitted). Creating a two-tiered analytical structure for assessing the duty of effective assistance, the Court distinguished cases where it is clear that deportation is certain, from cases where the immigration consequences of a plea are less clear, and then stated:

> [A] criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.
>
> [*Id.* at ——, 130 *S.Ct.* at 1483, 176 *L.Ed.*2d at 296.]

However, the Court recognized no distinction between providing affirmative misadvice and providing no advice, reasoning that to limit the holding to affirmative misadvice would absurdly give counsel "an incentive to remain silent on matters of great importance, even when answers are readily available," while a holding limited to misadvice would "deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available." *Id.* at ——, 130 *S.Ct.* at 1484, 176 *L.Ed.*2d at 296. The Court in *Padilla* concluded that counsel is duty-bound to provide a client "with available advice about an issue like deportation" and declared that "the failure to do so" satisfies the attorney-deficiency prong in *Strickland's* analysis. *Id.* at ——, 130 *S.Ct.* at 1484, 176 *L.Ed.*2d at 297. Thus, the Court held that, to satisfy a defendant's Sixth Amendment right to effective assistance of counsel, counsel has an affirmative obligation to inform a client-defendant when a plea places the client at risk of deportation. *Id.* at ——, 130 *S.Ct.* at 1486, 176 *L.Ed.*2d at 298.

Justice Alito penned a concurrence joined by Chief Justice Roberts. *Id.* at ——, 130 *S.Ct.* at 1487, 176 *L.Ed.*2d at 299 (Alito, J., concurring). Expressing strong divergent views about the role of defense counsel, Justice Alito summarized the duties defense counsel owes to noncitizen clients as follows: (1) they must not give unreasonably incorrect advice, as happened in *Padilla;* (2) they must alert the client that a plea may have deportation

consequences; and (3) they must tell clients that if they wish to know more, they should consult an immigration attorney. *Ibid.* Justice Alito specifically disagreed with the majority's conclusion that a defense attorney must affirmatively explain what the deportation consequences of a plea will be. *Id.* at ——, 130 *S.Ct.* at 1487, 176 *L.Ed.*2d at 299–300. He described that requirement as a "dramatic departure from precedent," one that "mark[ed] a major upheaval in Sixth Amendment law." *Id.* at ——, 130 *S.Ct.* at 1488, 1491, 176 *L.Ed.*2d at 300, 304. He also chided the majority for "casually dismiss[ing] the long-standing and unanimous position of the lower federal courts with respect to the scope of criminal defense counsel's duty to advise on collateral consequences." *Id.* at ——, 130 *S.Ct.* at 1491, 176 *L.Ed.*2d at 304.

In dissent, Justice Scalia, joined by Justice Thomas, referred to the Court's decision to require legal advice about the collateral consequences of a plea as having "no basis in text or in principle" of the Sixth Amendment. *Id.* at ——, 130 *S.Ct.* at 1495, 176 *L.Ed.*2d at 308–09 (Scalia, J., dissenting). In the dissent's view, the Sixth Amendment guarantees a defendant a lawyer "for his defense against a criminal prosecutio[n]—not for sound advice about the collateral consequences of a conviction." *Id.* at ——, 130 *S.Ct.* at 1494, 176 *L.Ed.*2d at 308 (alteration in original) (quotation marks omitted). And, the dissent viewed deportation as clearly a collateral consequence, rendering it categorically outside the scope of the Sixth Amendment's right to counsel. *Id.* at ——, 130 *S.Ct.* at 1495, 176 *L.Ed.*2d at 309. Indeed, going beyond Justice Alito's argument, the dissent asserted that because it is a collateral consequence, even affirmative misadvice about immigration consequences could not constitute ineffective assistance of counsel. *Id.* at ——, 130 *S.Ct.* at 1494–95, 176 *L.Ed.*2d at 308.

## III.

The aforementioned concurring and dissenting opinions are significant in particular for their emphasis on the change the

*Padilla* decision wrought on the landscape of ineffective assistance of counsel claims. The variety of views expressed in *Padilla* importantly share common recognition that the substantive changes in immigration law have been vast. In the past, noncitizens who committed certain crimes had opportunities to avoid deportation or removal, either through statutory waivers or the exercise of judicial discretion. However, beginning in 1990, most forms of relief for noncitizens who committed crimes qualifying as aggravated felonies were eliminated, thereby rendering them almost certain to be removed. The changes in immigration law provide necessary background information that sets the stage for the retroactivity question before us. Because understanding the evolution of federal immigration law over the past century is also essential in order to comprehend the importance to noncitizen defendants of legal advice regarding the immigration consequences of guilty pleas, we include the following summary of relevant immigration law developments.

## A.

Congress first enacted a statute limiting immigration in 1875, when it barred prostitutes and convicts from entering the United States. *See* An Act Supplementary to the Acts in Relation to Immigration, ch. 141, 18 Stat. 477; *see also* John D. Skrentny & Micah Gell–Redman, *Comprehensive Immigration Reform and the Dynamics of Statutory Entrenchment*, 120 *Yale L.J. Online* 325, 333–34 (2011). Subsequent legislation expanded the grounds for inadmissibility and exclusion, such that, by 1917, Congress established that noncitizens could be deported for crimes committed in the United States. *See* Immigration and Nationality Act of 1917, Pub.L. No. 64–301, § 19, 39 Stat. 874, 889 (1917) (rendering noncitizens deportable for committing crimes of moral turpitude); *see also* Anita Ortiz Maddali, *Padilla v. Kentucky: A New Chapter in Supreme Court Jurisprudence on Whether Deportation Constitutes Punishment for Lawful Permanent Residents?*, 61 *Am. U.L.Rev.* 1, 16–17 (2011). In 1922, narcotics offenses were

added to the list of crimes that could trigger deportation. *See* Act of May 26, ch. 202, 42 Stat. 596 (1922).

Subsequently, Congress passed the INA, and although it has been amended repeatedly, it continues to serve as the basis for federal law governing entry, exclusion, and removal of noncitizens. *See* 8 *U.S.C.A.* §§ 1101 to 1537; *see also* Charles Gordon et al., 1 *Immigration Law & Procedure* §§ 1.02(3)(c), 2.03 (2011). Section 237(a)(2) of the INA enumerates categories of noncitizens who are subject to removal, including those convicted of crimes of moral turpitude, any controlled substance offense other than simple possession of small amounts of marijuana, and any "aggravated felony." 8 *U.S.C.A.* § 1227(a)(2).

The list of offenses qualifying as aggravated felonies, as set forth in Section 101(a)(43) of the INA, is extensive, and includes, among others, such crimes as illicit trafficking in a controlled substance, illicit trafficking in firearms, certain crimes against minors, violent crimes resulting in at least one year of imprisonment, theft or burglary offenses resulting in at least one year of imprisonment, certain money laundering crimes, and certain human trafficking offenses. *See* 8 *U.S.C.A.* § 1101(a)(43) (defining aggravated felony). More recent legislation, including the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRAIRA), expanded the number of offenses that are considered aggravated felonies. *See* Pub.L. No. 104–208, § 321, 110 Stat. 3009, 3627–28 (1996). Importantly, removal of a noncitizen convicted of an aggravated felony is mandatory, *see* 8 *U.S.C.A.* § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."), and with few forms of relief available, a near certainty. *See Padilla, supra*, 559 *U.S.* at ——, 130 *S.Ct.* at 1480, 176 *L.Ed.*2d at 292.

Despite authorizing removal based on the commission of certain enumerated crimes, Congress initially vested discretion with sentencing judges at both the state and federal level to recommend that a removable noncitizen not actually be removed. *See* Maddali, *supra*, at 17. That procedure, commonly called a judicial

recommendation against deportation (JRAD), had binding effect. *See ibid.; see also* 8 *U.S.C.A.* § 1251(b)(2) (1990) (setting forth JRAD procedure). The INA also includes several waiver and relief provisions, such as those set forth in Sections 212(c), 212(h), 244, and 245(i), that allowed some noncitizens who were eligible for removal to escape that consequence. *See, e.g.,* 8 *U.S.C.A.* §§ 1182, 1254, and 1255 (setting forth certain waiver provisions); *see also* Maddali, *supra,* at 17 (describing Section 212(c) relief from deportation).

In 1990, Congress began eliminating those forms of relief for noncitizens who committed aggravated felonies. The Immigration Act of 1990 repealed the provision permitting JRADs, thereby eliminating judicial discretion in cases involving removal of noncitizens who committed aggravated felonies. *See* Pub.L. No. 101–649, § 505, 104 Stat. 4978, 5050 (1990); *see also* Stephen H. Legomsky, *The New Path of Immigration Law: Asymmetric Incorporation of Criminal Justice Norms,* 64 *Wash. & Lee L.Rev.* 469, 498 (2007). In the same statute, Congress restricted the availability of Section 212(c) waivers, making anyone who served a term of at least five years' imprisonment for an aggravated felony ineligible. *See* Pub.L. No. 101–649, § 511, 104 Stat. 4978, 5052 (1990); *see also* Maddali, *supra,* at 18. The INA was amended again in 1996, pursuant to Section 441(d) of the Antiterrorism and Effective Death Penalty Act (AEDPA), which made *all* noncitizens who committed aggravated felonies ineligible for 212(c) waivers. *See* Pub.L. No. 104–132, 110 Stat. 1214 (1996); *see also* Lupe S. Salinas, *Deportations, Removals and the 1996 Immigration Acts: A Modern Look at the Ex Post Facto Clause,* 22 *B.U. Int'l L.J.* 245, 255–56 (2004). IIRAIRA further restricted the availability of waivers, cancellation of removal, and other previous forms of relief. *See* Pub.L. No. 104–208, § 348, 110 Stat. 3009, 3039 (1996); *see also* Gordon, *supra,* at § 2.04(14)(c).

Because of those changes to immigration laws, "if a noncitizen has committed a removable offense after the 1996 effective date of these amendments, his removal is practically inevitable...." *Pa-*

*dilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1480, 176 *L.Ed.*2d at 292.

## B.

As noted, well prior to our holding in *Nuñez–Valdéz,* this Court had taken the position that a defendant's guilty plea is not vulnerable because neither the court nor counsel warned the defendant about the deportation consequences of the guilty plea. *See Heitzman, supra,* 107 *N.J.* at 604, 527 *A.*2d 439 ("[D]efendant need be informed only of the penal consequences of his plea and not the collateral consequences, such as . . . effect on immigration status . . . ." (citation and quotation marks omitted)). The distinction between penal and collateral consequences was reaffirmed by this Court as recently as 2005. *See State v. Johnson,* 182 *N.J.* 232, 236, 864 *A.*2d 400 (2005) ("Although a court is not responsible for informing a defendant of all consequences flowing from a guilty plea, at a minimum the court must ensure that the defendant is made fully aware of those consequences that are 'direct' or 'penal.' ") (citing *Howard, supra,* 110 *N.J.* at 122, 539 *A.*2d 1203).

That said, with *Nuñez–Valdéz,* our Court agreed with the trial court that wrong or inaccurate advice from counsel about the immigration consequences, and specifically deportation, that would result from entry of a guilty plea, presented ineffective assistance of counsel. 200 *N.J.* at 141–42, 975 *A.*2d 418 (finding support for trial court's deficiency holding). That holding reflected previous concern that a plea cannot be entered knowingly and voluntarily when an attorney affirmatively gives wrong or inaccurate information material to a pleading defendant about the consequences of a guilty plea. *See id.* at 139–42, 975 *A.*2d 418; *see also Bellamy, supra,* 178 *N.J.* at 142, 835 *A.*2d 1231 (discussing importance to pleading client of understanding plea's consequences); *State v. Nichols,* 71 *N.J.* 358, 361, 365 *A.*2d 467 (1976) (allowing defendant to withdraw plea where he was misinformed about material element of plea); *Garcia, supra,* 320 *N.J.Super.* at 339–40, 727 *A.*2d

97 (stating that pleas may be vacated when defendants are provided with affirmative misinformation).

Moreover, notwithstanding that deportation was a potential collateral consequence of a guilty plea, *see Heitzman, supra,* 107 *N.J.* at 604, 527 *A.*2d 439, our Court ensured that notice of that possible consequence was provided to a criminal defendant through inclusion of a question addressing the subject in our required plea form. In 1988, what is today known as Question 17, and was then labeled Question 16, was incorporated into the plea form. *See* Administrative Directive # 1–1988 (Jan. 15, 1988). It was added in response to Chief Justice Wilentz's *Heitzman* dissent, which had urged that defendants be advised of the deportation consequences of their guilty pleas, 107 *N.J.* at 606–07, 527 *A.*2d 439 (Wilentz, C.J., dissenting), and expressed concern that "the possibility of deportation, even if viewed as a collateral consequence, obviously can have a severe impact on a person's life," *id.* at 606, 527 *A.*2d 439 (citation omitted). In its original form, the question asked if a defendant who is not a citizen understood that he "may be deported by virtue of [the] plea of guilty." Administrative Directive # 1–1988 (Jan. 15, 1988).

The question remained in that form throughout the changes in immigration law during the 1990s and early years of the new millennium that incrementally removed discretion from the system and tilted more and more toward compelling deportation. Eventually, the plea form question was broken into two parts—first asking if the defendant was a citizen and, if the response was no, then asking whether the defendant understood that he "*may* be deported by virtue of [his] plea of guilty." Administrative Directive # 14–08 (Oct. 8, 2008), *available at* http://www.judiciary. state.nj.us/directive/2008/dir_14_08.pdf (emphasis added). Plainly, despite the added emphasis of the two-part question, the essential phraseology remaining in the second part to the question demonstrated uneasiness with any attempt to craft a question that could come close to addressing the many nuances that could arise in a noncitizen's circumstances. A subsequent 2009 amendment to Question 17, which was in part a response to concerns expressed

in *Nuñez–Valdéz,* added more subparts, which inquired into a defendant's understanding that he *will* be subject to deportation for pleading guilty to a crime constituting an "aggravated felony" under federal law and asked whether the defendant understood his right to seek legal advice on his immigration status before pleading guilty. Administrative Directive # 08–09 (Sept. 4, 2009), *available at* http://www.judiciary.state.nj.us/directive/2009/dir_08_09.pdf. Even that refinement did not obligate defense counsel to become an immigration counselor, but it did attempt to raise a defendant's consciousness of the risk of deportation and to provide an opportunity for a defendant to seek counsel specialized in the finer points of immigration law.[7] Nothing in that change foretold that defense counsel was expected to become versed in immigration law in order to secure a knowing and voluntary plea.

---

[7] As of August 2011, the plea form was again amended. *See* Administrative Directive # 05–11 (Aug. 1, 2011), *available at* http://www.judiciary.state.nj.us/directive/2011/dir_05_11.pdf. Question 17, in its most recent iteration, states as follows:

17. a. Are you a citizen of the United States? [Yes] [No]
If you have answered "No" to this question, you must answer Questions 17b–17f. If you have answered "Yes" to this question, proceed to Question 18[.]
b. Do you understand that if you are not a citizen of the United States, this guilty plea may result in your removal from the United States and/or stop you from being able to legally enter or re-enter the United States? [Yes] [No]
c. Do you understand that you have the right to seek individualized advice from an attorney about the effect your guilty plea will have on your immigration status? [Yes] [No]
d. Have you discussed with an attorney the potential immigration consequences of your plea? If the answer is "No," proceed to question 17e. If the answer is "Yes," proceed to question 17f. [Yes] [No]
e. Would you like the opportunity to do so? [Yes] [No]
f. Having been advised of the possible immigration consequences and of your right to seek individualized legal advice on your immigration consequences, do you still wish to plead guilty? [Yes] [No]
[*Ibid. See also* Administrative Directive # 09–11 (Dec. 28, 2011), *available at* http://www.judiciary.state.nj.us/directive/2011/dir_09_11.pdf (requiring municipal courts to advise defendants of immigration consequences of guilty pleas).]

We now turn to the question of *Padilla's* retroactivity.

## IV.

### A.

Both the Attorney General and the State maintain that the Supreme Court's holding in *Padilla* represents a new rule that does not apply on collateral review in either appeal. Rather, both essentially argue that under a federal retroactivity analysis, *Padilla* announced a new rule that should be given pipeline retroactivity to the case in which the rule was announced, all cases on direct review, and all future cases, but not in cases on collateral review, such as the present appeals from PCR claims.

As for defendants, Gaitan resists the argument that *Padilla* represents a new rule and, further, emphasizes that he was misinformed about the deportation consequences of his plea as a result of the *absence* of specific information about the immigration consequences he faced. Goulbourne, on the other hand, seemingly assumes that *Padilla* represents a new rule of law but contends that retroactivity does not depend on whether the case is on direct or collateral review; rather, he emphasizes that his plea was flawed because although he was informed that he "very well may" be deported as a result of his plea, he was not told that deportation would be automatic.

### B.

 *Teague v. Lane*, 489 *U.S.* 288, 109 *S.Ct.* 1060, 103 *L.Ed.*2d 334 (1989), governs retroactivity under federal law. *See Whorton v. Bockting*, 549 *U.S.* 406, 416, 127 *S.Ct.* 1173, 1181, 167 *L.Ed.*2d 1, 10–11 (2007). In essence, in determining whether a rule is applied retroactively, the decision turns on whether the rule is considered new or old. *See ibid.* A new rule generally does not apply retroactively to a case where direct appeal is over and the case is only being reviewed on a collateral basis. *See Teague, supra*, 489 *U.S.* at 310, 109 *S.Ct.* at 1075, 103 *L.Ed.*2d at 356.

 A rule of law is new if it "breaks new ground" and is one whose "result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301, 109 *S.Ct.* at 1070, 103 *L.Ed.*2d at 349. In turn, an outcome is not dictated by precedent if it is "susceptible to debate among reasonable minds." *Butler v. McKellar,* 494 *U.S.* 407, 415, 110 *S.Ct.* 1212, 1217, 108 *L.Ed.*2d 347, 356 (1990). Disagreement among federal courts or among Supreme Court justices has been recognized as evidence of such reasonable debate. *See Beard v. Banks,* 542 *U.S.* 406, 414–15, 124 *S.Ct.* 2504, 2512, 159 *L.Ed.*2d 494, 505 (2004) (finding dissent of four justices was evidence that reasonable jurists could differ); *Butler, supra,* 494 *U.S.* at 415, 110 *S.Ct.* at 1217, 108 *L.Ed.*2d at 356–57 (noting circuit split as evidence that reasonable minds could differ). The existence of conflicting authority is not of itself dispositive that a rule is new, however. *See Williams v. Taylor,* 529 *U.S.* 362, 410, 120 *S.Ct.* 1495, 1522, 146 *L.Ed.*2d 389, 428 (2000).[8]

 That said, for *new* rules there is a "general rule of nonretroactivity" on collateral review. *Danforth v. Minnesota,* 552 *U.S.* 264, 279, 128 *S.Ct.* 1029, 1040, 169 *L.Ed.*2d 859, 871 (2008). A new rule only applies retroactively on collateral review if it fits into one of two exceptions: either it "render[s] types of primary conduct 'beyond the power of the criminal law-making authority to proscribe,' " or it is a " 'watershed' rule[ ] that 'implicate[s] the fundamental fairness of the trial.' " *Id.* at 274–75, 128 *S.Ct.* at 1037–38, 169 *L.Ed.*2d at 868 (quoting *Teague, supra,* 489 *U.S.* at 311–12, 109 *S.Ct.* at 1075–76, 103 *L.Ed.*2d at 356). Neither of those exceptional circumstances is evident here. The case does not implicate substantive criminal activity nor does it reach the

---

[8] Conflicting authority or not, the Court conversely has cautioned that when a court applies a rule of general application to new facts, "it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Williams, supra,* 529 *U.S.* at 382, 120 *S.Ct.* at 1507, 146 *L.Ed.*2d at 411 (Stevens, J., concurring) (quoting *Wright v. West,* 505 *U.S.* 277, 308–09, 112 *S.Ct.* 2482, 2500, 120 *L.Ed.*2d 225, 249–50 (1992) (Kennedy, J., concurring)).

heights required for a "watershed" rule. To be a "watershed" rule, the rule must both "be necessary to prevent an impermissibly large risk of an inaccurate conviction" and "must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Whorton, supra,* 549 *U.S.* at 418, 127 *S.Ct.* at 1182, 167 *L.Ed.*2d at 12 (citations and quotation marks omitted). To meet the latter requires an extraordinary showing. *Id.* at 421, 127 *S.Ct.* at 1183, 167 *L.Ed.*2d at 14.[9] Since it was announced in *Teague,* no new rule has met the "watershed" threshold. *Id.* at 418, 127 *S.Ct.* at 1182, 167 *L.Ed.*2d at 12.

Thus, the retroactivity issue under federal law devolves to whether *Padilla* represented the announcement of a new rule or not.

## C.

### 1.

In the wake of *Padilla,* federal district courts were divided on whether it was retroactive. *See Chaidez v. United States,* 655 *F.*3d 684, 688 (7th Cir.2011) (citing examples); *Diop v. ICE/Homeland Sec.,* 656 *F.*3d 221, 228 n. 5 (3d Cir.2011) (same).

A smaller body of law exists among the circuit courts, though the existing cases similarly reflect a division on the question of *Padilla's* retroactivity. The Third Circuit, the first Court of Appeals to address the issue, initially concluded that *Padilla* involved the application of the existing *Strickland* test, which made its holding applicable on collateral review. *See United States v. Orocio,* 645 *F.*3d 630, 634 (2011). However, the same panel of Third Circuit judges thereafter noted both that "there is no judicial consensus on the issue [of *Padilla's* retroactivity] and [that] many lower courts have come to a contrary conclusion."

---

[9] The only example that the Supreme Court has provided of a new rule that would have qualified as a watershed rule is *Gideon v. Wainwright's* holding that indigent criminal defendants must be provided counsel. *See Whorton, supra,* 549 *U.S.* at 419, 127 *S.Ct.* at 1182, 167 *L.Ed.*2d at 12–13.

*Diop, supra,* 656 *F.*3d at 228 n. 5 (calling possibility that *Padilla* is not retroactive "far from remote"). And, both the Tenth and Seventh Circuit Courts of Appeal recently have concluded that *Padilla* announced a new rule of law, holding therefore that, under *Teague's* retroactivity analysis, it should not be retroactively applied to cases on collateral review. *See Chaidez, supra,* 655 *F.*3d at 694; *United States v. Chang Hong,* 671 *F.*3d 1147 (10th Cir.2011).

■ Because *Padilla* involved an application extending *Strickland* to an area of attorney performance previously unaddressed by the Supreme Court, and did not involve the overruling of an earlier precedent, the retroactivity analysis is aptly designated as "difficult." *See Chaidez, supra,* 655 *F.*3d at 689 (citing *Saffle v. Parks,* 494 *U.S.* 484, 488, 110 *S.Ct.* 1257, 1260, 108 *L.Ed.*2d 415, 424 (1990)). Guided by federal retroactivity law, we are persuaded that *Padilla* represents a new rule of law that, under federal law, is not retroactive and is therefore inapplicable to cases on collateral review. In reviewing the developing law, the stronger argument lies against *Padilla's* retroactivity. That argument succeeds in the *Chaidez* and *Chang Hong* decisions, both of which rely in large part on the array of views expressed in the majority, concurring, and dissenting opinions of the justices writing in *Padilla* in finding that the *Padilla* decision was not dictated by precedent and that it represents a new and novel rule, notwithstanding its *Strickland* setting.

2.

A major argument in favor of *Padilla's* retroactivity is that it involves the application of the time-honored *Strickland* test for ineffective assistance of counsel to new facts concerning attorney performance and, therefore, cannot meet the definition of a new rule. *See Williams, supra,* 529 *U.S.* at 382, 120 *S.Ct.* at 1507, 146 *L.Ed.*2d at 411. Implicit in our finding that *Padilla* was not dictated by precedent is rejection of the argument that no case

applying the *Strickland* test can announce a new rule. As the *Chaidez* court noted,

[e]ven the majority [in *Padilla* ] suggested that the rule it announced was not dictated by precedent, stating that while Padilla's claim follow[ed] from its decision applying *Strickland* to advice regarding guilty pleas in *Hill v. Lockhart*, *Hill* does not control the question before us.... *Padilla* can only be considered an old rule if Supreme Court precedent compelled the result. The majority's characterization of *Hill* suggests that it did not understand the rule set forth in *Padilla* to be dictated by precedent.

[*Id.* at 689–90 (citations and quotation marks omitted).]

Although the issue is a challenging one, as we see it, *Padilla* involved no simple application of the well-established *Strickland* rule to a new set of facts. Prior to *Padilla*, "the [Supreme] Court had never held that the Sixth Amendment requires a criminal defense attorney to provide advice about matters not directly related to their client's criminal prosecution." *Chaidez, supra,* 655 *F*.3d at 693. Now, counsel must provide affirmative advice on a subject not formerly required and, importantly, ineffective assistance claims may be substantiated on grounds other than giving affirmative misinformation. *See ibid.* There are uncertain contours to the scope of advice about the risk of deportation that, under the majority's holding, now must be addressed by counsel. *See ibid.* That uncertainty about the scope of advice now required, on a subject not before made a mandatory subject for review with a pleading noncitizen client, naturally affects our perspective that this pronouncement is a "new" rule of law. And, it directly impacts whether it must be applied retroactively when reviewing, collaterally, pleas entered before this obligation was made express. Indeed, the Tenth Circuit emphasized that point, stating "*Padilla* is a new rule of constitutional law not because of *what* it applies—*Strickland*—but because of *where* it applies— collateral immigration consequences of a plea bargain." *Chang Hong,* 671 *F*.3d at 1156.

That reasonable minds could disagree about anticipating *Padilla's* holding is illustrated not only by the various points of view expressed in the *Padilla* opinions, but also by the pre-*Padilla* opinions of lower federal courts, including nine circuit courts, and

many state courts that had concluded there was no Sixth Amendment duty to warn clients about the risk of a collateral consequence, including deportation, from a guilty plea. *See Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1481 n. 9, 176 *L.Ed.*2d at 293 n. 9 (collecting cases); *Chang Hong, supra,* 671 *F.*3d at 1154 (citing Gabriel J. Chin & Richard W. Holmes, Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas,* 87 *Cornell L.Rev.* 697, 699 (2002)). That case law weighs heavily in favor of finding that *Padilla* announced a new rule of constitutional law.

Although the Supreme Court had not previously foreclosed application of a *Strickland* analysis to attorney performance in respect of collateral consequences of a guilty plea, neither had it held such an analysis to be applicable. *See Chang Hong, supra,* 671 *F.*3d at 1155. The weight of that precedent is not overridden by the *Padilla* majority's resort to developments about professional standards, as salutary as they undoubtedly are. Professional standards cannot themselves establish a rule of law; only a court holding can accomplish that. *See Bobby v. Van Hook,* —— *U.S.* ——, 130 *S.Ct.* 13, 17, 175 *L.Ed.*2d 255, 259 (2009) (per curiam) (citing *Strickland* to underscore that standards from professional organizations such as ABA serve as guides, not definitions, of reasonable performance); *id.* at ——, 130 *S.Ct.* at 20, 175 *L.Ed.*2d at 262–63 (Alito, J., concurring) ("It is the responsibility of the courts to determine the nature of the work that a defense attorney must do . . . in order to meet the obligations imposed by the Constitution."). Although the Supreme Court stated in *INS v. St. Cyr* that defense counsel should advise clients about immigration consequences, *see* 533 *U.S.* 289, 323 n. 50, 121 *S.Ct.* 2271, 2291 n. 50, 150 *L.Ed.*2d 347, 376 n. 50 (2001), the context was not a discussion of the Sixth Amendment right to counsel, and the Court did not require such advice.

As noted, even *Padilla* itself does not provide evidence that the Court believed it was discussing and applying an "old" or existing rule of law. We draw no inference supportive of such a belief

from the fact that *Padilla* was heard on habeas corpus review, for *Teague's* holding—that a new rule does not apply on collateral review unless it fits into an exception—can be waived,[10] and Kentucky did not raise as a defense that Padilla was seeking application of a new rule on habeas corpus review. *See Chaidez, supra,* 655 *F.*3d at 693–94. It is more likely that the Court viewed *Teague* as waived for purposes of its application to Padilla's ineffective assistance of counsel claim, than that the opinion, in its entirety, be regarded as incorporating a retroactivity analysis applicable to all matters on collateral review. *See id.* at 694. Further, the *Padilla* majority's dismissal of concerns about unleashing a flood of challenges to final convictions, *see Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1484–85, 176 *L.Ed.*2d at 297–98, is fairly ambiguous. If *Padilla* constituted an "old" rule, it would apply to all cases on direct appeal or collateral review; but, if it constituted the announcement of a new rule not within a recognized exception in the retroactivity analysis, then it nevertheless would apply to all pled cases on direct appeal with postconviction ineffective assistance of counsel claims yet to be addressed and could unsettle a great number of pleas through a "flood" of challenges to final convictions. The Court could have been referring to one, or the other, degree of floods. The mere reference to a flood is not illuminating of the question at hand.

In the end, the fact that *Padilla* involves an extension of *Strickland* is not determinative of whether it is a new rule or not. As the Seventh Circuit stated when reaching the same determination,

[w]e recognize that the application of *Strickland* to unique facts generally will not produce a new rule.... However, that guiding principle is not absolute. We

---

10 The *Teague* retroactivity analysis "is not 'jurisdictional' in the sense that [federal courts] ... must raise and decide the issue *sua sponte." Caspari v. Bohlen,* 510 *U.S.* 383, 389, 114 *S.Ct.* 948, 953, 127 *L.Ed.*2d 236, 245 (1994) (alteration in original) (quoting *Collins v. Youngblood,* 497 *U.S.* 37, 41, 110 *S.Ct.* 2715, 2718, 111 *L.Ed.*2d 30, 38 (1990)). If retroactivity under *Teague* is not raised, a court need not address the question. *See ibid.* (citing *Schiro v. Farley,* 510 *U.S.* 222, 228–29, 114 *S.Ct.* 783, 788–89, 127 *L.Ed.*2d 47, 55–56 (1994)).

believe *Padilla* to be the rare exception. Before *Padilla,* the Court had never held that the Sixth Amendment requires a criminal defense attorney to provide advice about matters not directly related to their client's criminal prosecution. In *Padilla,* the Court held that constitutionally effective assistance of counsel requires advice about a civil penalty imposed by the Executive Branch ... after the criminal case is closed. In our view, that result was sufficiently novel to qualify as a new rule. Indeed, if *Padilla* is considered an old rule, it is hard to imagine an application of *Strickland* that would qualify as a new rule. Perhaps in the future the Court will conclude, given the breadth and fact-intensive nature of the *Strickland* reasonableness standard, that cases extending *Strickland* are never new. But until that time, we are bound to apply *Teague* in the context of *Strickland.*

[*Chaidez, supra,* 655 *F.*3d at 692–93 (citations omitted).]

We similarly conclude that *Padilla* represents a new constitutional rule of law that, for Sixth Amendment purposes, is not entitled to retroactive application on collateral review under *Teague.* We cannot say that prior to issuance of the holding in *Padilla,* attorneys would have known or expected that the constitutional benchmark for effective assistance of counsel required that they advise noncitizen clients of the risk of immigration consequences, and further that they must do so even when the risk of those consequences is not clearly predictable. *Padilla* unequivocally establishes that it is now mandatory to advise on the subject as part of providing constitutionally effective assistance of counsel to a pleading noncitizen criminal defendant. Specific counseling must occur when the risk of deportation arises as a result of a guilty plea. The *Padilla* obligation of counsel is thus broad, not precisely defined, and most importantly novel as the new baseline constitutional standard for performance. Notwithstanding our dissenting colleagues' well-intentioned desire to portray this affirmative obligation to advise on immigration consequences as one long-recognized by the defense bar, the assertion finds inadequate support through the cited references to professional organizations' advocacy standards. As previously noted, professional organizations, although a source of information on preferred professional norms, do not *set* the standard for constitutional performance. *See Van Hook, supra,* —— *U.S.* at ——, 130 *S.Ct.* at 17, 175 *L.Ed.*2d at 259. Justice Alito's writing on this subject only underscores that the constitutionally required level of

performance must be defined by the courts. *See id.* at ——, 130 *S.Ct.* at 20, 175 *L.Ed.*2d at 262–63 (Alito, J., concurring).

In sum, based on our review of the pertinent standards and persuasive authority available, we hold that *Padilla's* new constitutional pronouncement is not entitled to retroactive application on collateral review based on federal retroactivity standards.

### D.

 Because it is unclear in defendant Goulbourne's appeal whether he is arguing for retroactivity of *Padilla* based only on federal law, or on federal and state law, we also address *Padilla* from a state retroactivity law perspective and further hold that *Padilla* is not entitled to retroactive application based on a state law retroactivity analysis. *See State v. Dock,* 205 *N.J.* 237, 254, 15 *A.*3d 1 (2011) (citing *State v. Cummings,* 184 *N.J.* 84, 97, 875 *A.*2d 906 (2005)) (acknowledging that New Jersey's retroactivity analysis, like federal law, pivots on whether rule is "new").[11]

Certainly, measured at the time of Goulbourne's guilty plea in 2008, *Padilla* was novel and unanticipated. Prior to *Nuñez–Valdéz,* immigration consequences had been categorized as collateral consequences of a guilty plea as to which there was no

---

[11] The first step is to determine if the rule is a "new rule." *Ibid.* (citing *Cummings, supra,* 184 *N.J.* at 97, 875 *A.*2d 906). The standard in that respect is similar to federal law: A rule is new if "it breaks new ground or imposes a new obligation on the State or if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* at 255, 15 *A.*3d 1 (citations and quotation marks omitted). If the rule is new, the next determination is whether it should apply retroactively, which requires a balancing of three factors:

> (1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice.
> [*Ibid.* (quoting *Cummings, supra,* 184 *N.J.* at 97, 875 *A.*2d 906 (citation omitted)).]

The first factor, the purpose of the rule, is "pivotal." *Ibid.* (citing *Cummings, supra,* 184 *N.J.* at 97, 875 *A.*2d 906).

obligation to warn defendants. *See Heitzman, supra,* 107 *N.J.* at 604, 527 *A.*2d 439. Thus, *Padilla's* holding that, if the deportation consequences are clear, a defendant *must* be warned that he or she will be deported was a new rule of law compared to the existing law in New Jersey.

With *Nuñez–Valdéz,* our Court expressly acknowledged that wrong advice, followed by inaccurate and misleading information on immigration consequences (and specifically deportation) that is material to a pleading noncitizen client, can present ineffective assistance of counsel. But, *Padilla* now goes further than *Nuñez–Valdéz's* requirements in respect of both aspects to its holding. *Padilla* holds that "when the deportation consequence [of a guilty plea] is truly clear," counsel's affirmative duty and obligation is to address the subject and to "give correct advice." 559 *U.S.* at ——, 130 *S.Ct.* at 1483, 176 *L.Ed.*2d at 296. Thus, under *Padilla's* holding, specific advice must be given on deportation consequences denoted as mandatory under federal law. *Ibid.* That was not our law, even under the *Nuñez–Valdéz* holding. Moreover, affirmative advice must be given even when the risk of immigration consequences is less than crystal clear. *Ibid.* The *Padilla* decision modulated its requirement in those scenarios, stating that "[w]hen the law is not succinct and straightforward," and "the deportation consequences of a particular plea are unclear or uncertain," "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Ibid.* That additional affirmative obligation requires a new, and nuanced, analysis that also was never before articulated in our case law.

We already have held that the narrow definition of what constitutes a new rule compels the conclusion that *Padilla* announced a new rule, and that federal retroactivity law therefore holds that *Padilla* is not entitled to retroactive effect on collateral review. We reach the same conclusion using a state retroactivity analysis. That said, although *Padilla* will not apply retroactively, *Nuñez–Valdéz* still governs the standard of attorney performance in New

Jersey in ineffective assistance of counsel claims on collateral review. Thus, if either of the PCR applicants in the present appeals presents a claim showing that he was provided with false and affirmatively misleading advice when entering his plea, then the standard of performance expected of counsel may have been breached.

We thus turn to the specific facts of the two matters consolidated for purposes of this appeal.

## V.

### A.

Defendant Gaitan claims that he was misinformed on the immigration consequences of his plea agreement and that he is entitled to a hearing on his petition for post-conviction relief. Although Gaitan claims that he received no information, he concedes that the record contains evidence that he reviewed the plea form with counsel. Notations on the plea form indicate that Question 17 was addressed with him, and no evidence was proffered demonstrating that he received any misinformation on the subject. Therefore, Gaitan, at a minimum, was put on notice of the issue of potential immigration consequences through the plea form, which distinguishes this matter from *Nuñez–Valdéz*, where the defendant received false and affirmatively misleading information.

Nevertheless, Gaitan compares the absence of information about the immigration consequences of his plea to misinformation, and thus claims a right to an evidentiary hearing. He further asserts that the plea colloquy could not cure the lack of notice because the colloquy did not involve a specific explanation of Question 17, but instead inquired only generally about his understanding of the plea form. Defendant adds that deportation as a result of his plea easily would have been ascertainable from the relevant removal statute, but neither counsel nor the court advised him of that.

As noted previously, the rule announced in *Nuñez–Valdéz* was not a new rule of law in New Jersey's appellate case law. In 2005, when Gaitan entered his guilty plea, case law addressing the provision of misinformation to a defendant as to the deportation consequences of a guilty plea supported that the rendering of incorrect advice to a defendant on the deportation consequences of a plea agreement could be sufficient to prove a prima facie case of ineffective assistance of counsel. *See Garcia, supra,* 320 *N.J.Super.* at 339–40, 727 *A.*2d 97; *Chung, supra,* 210 *N.J.Super.* at 434–35, 510 *A.*2d 72.

The State concedes that *Nuñez–Valdéz* did not announce a new rule, and that its holding applies on collateral review to defendant's plea. However, the State contends that defendant neither received incorrect advice nor was affirmatively misadvised with regard to his immigration status and, therefore, he is not entitled to an evidentiary hearing under *Nuñez–Valdéz*. We agree, first, that *Nuñez–Valdéz* did not announce a new rule of law with respect to Gaitan's plea. And, we agree, second, that *Nuñez–Valdéz* does not afford relief to Gaitan because it addressed affirmative misinformation and misleading advice, as opposed to an absence of advice regarding deportation consequences of a plea agreement. We cannot conclude that before *Padilla's* pronouncement about the duty to advise on the mandatory deportation consequences of certain convictions, the law required counsel to have affirmatively advised Gaitan on that subject. We are unable to conclude that following the then-existing plea form resulted in misadvice being provided to Gaitan, particularly where there is no evidence or claim that, at the time, defendant sought more information about immigration consequences and was then misinformed by counsel.

In sum, *Padilla* does not apply retroactively to impose a higher obligation on counsel, and we find no violation of *Nuñez–Valdéz's* holding in the record presented by Gaitan. That we determined in *Nuñez–Valdéz* to further refine the plea form does not render as misadvice the information that was provided to Gaitan through

the then-existing plea form, nor did the revised plea form vest further rights in Gaitan or others who seek to have their pleas reviewed collaterally. Rather, the changes to our plea form reflect the challenge involved in predicting with certainty the immigration consequences of a guilty plea.

Because Gaitan neither received affirmative misadvice, nor provided any support for his bald assertion that he would not have pled had he known of the deportation consequences, he is not entitled to an evidentiary hearing.

### B.

Defendant Goulbourne had the benefit of an evidentiary hearing conducted by the PCR court on April 8, 2010. In the PCR court's decision, issued the next day, the PCR court gave Goulbourne "the benefit of the doubt" that he would not have pled guilty had he been better advised of the certainty of deportation and granted post-conviction relief, vacating the guilty plea previously entered. The Appellate Division affirmed the judgment.

The PCR court was mistaken in giving "the benefit of the doubt" to Goulbourne that he would not have pled guilty, for that is not the correct standard in a PCR setting. A defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence. *See Echols, supra,* 199 *N.J.* at 357, 972 *A.*2d 1091; *Goodwin, supra,* 173 *N.J.* at 593, 803 *A.*2d 102. Upon our review of the record before the PCR court, as well as the transcripts of Judge Marmo's extensive questioning of Goulbourne when taking Goulbourne's plea, we are more than satisfied that Goulbourne failed to carry his required burden of proof.

Defendant was observed by police officers as he engaged in two drug transactions on a Paterson street within one thousand feet of a public school and within five hundred feet of a public library. The buyers were apprehended immediately following each transaction, and marijuana was found in their possession. When the officers approached Goulbourne, he ran into a nearby apartment

and was taken into custody there, where currency and bagged marijuana were in plain view. Before he was indicted, he was offered a plea deal and turned it down. After indictment, and on the day trial was to begin, Goulbourne decided to accept the plea deal, and Judge Marmo questioned him about the agreement. As the record created that day reveals, both the judge and counsel clearly informed defendant that his plea could result in deportation consequences and that immigration officials could deport him.

We see no deficiency on this record, a point made evident on review of the transcript, which details the following colloquy:

Judge: Okay. Now let me ask you this. Are you a citizen of the United States?

Defendant: No, sir.

Judge: You're not. Where were you born?

Defendant: I was born in Kingston, Jamaica.

Judge: Jamaica. How long have you been in the U.S.?

Defendant: Been in the U.S. 11 years now.

Judge: All right. I'm sure you understand that by reason of this conviction, you could be deported to Jamaica—

Defendant: I heard.

Judge:—to your country? You understand that?

Defendant: Yes, sir.

Judge: All right. Okay. And I see you've indicated that on your plea form, so you're aware of that. It would be up to Immigration. But you have to understand that they may very well deport you. You understand?

Defendant: Yes, sir.

Judge: Okay. All right. Any other questions about your plea agreement? I have some other questions I want to go over with you.

Defendant: No.

Defense counsel also discussed with defendant the deportation consequences of his guilty plea:

Counsel: Okay. Are there any questions that you want to ask the Judge and myself about your guilty plea?

Defendant: Meaning what like?

Counsel: Are there any other questions that you want to ask—

Defendant: No.

Counsel:—the Court?

Defendant: No, I don't.

Counsel: Okay. You understand, as the Judge indicated to you, that as a result of this plea, it's not guaranteed because we don't know—we don't deal with this any of us, the Judge, the Prosecutor, myself, we don't deal with this personally, so we don't know what gets done in the—in the Immigration Services and the Immigration Court. But they have the right to deport you, and they may very well do that back to Jamaica as a result of this. Do you understand that?

Defendant: Yes.

Counsel: That won't take place until after you finish your jail time. Do you understand?

Defendant: Yes.

&ast; &ast; &ast;

Counsel: You're going to lose your driving privileges. *If they don't deport you,* you won't be able to drive for at least six months, possibly up to two years. Do you understand that?

Defendant: Yes, sir.

[Emphasis added.]

Although Goulbourne had no questions about the deportation consequences of his plea, he had a great many questions concerning why he could not get the pre-indictment plea offer of probation with 364 days in county jail, but instead now had before him a plea offer that required him to serve fifteen months without parole. After it was repeatedly explained that the pre-indictment offer was no longer available and Goulbourne persisted in requesting the pre-indictment offer, the court stated that it believed further discussion was fruitless and indicated that it would impanel a jury for trial. Following a short recess, defendant entered a guilty plea to the only plea offer on the table and provided a factual basis for that plea. He was sentenced in accordance with the plea agreement.

During his PCR evidentiary hearing, Goulbourne admitted that he was guilty of the charges and stated that his initial trial concerns were not about guilt but about how long a time he would serve in jail. Indeed, he admitted that he recognized deportation was a possibility but that it was not his concern at the time. His priority was minimizing the amount of jail time, which certainly is reflected in the transcript of his discussions with Judge Marmo. On this record, looking ahead to the prejudice prong, we find no

evidence of prejudice, as Goulbourne's attention was clearly else-where.

Goulbourne testified during his evidentiary hearing on PCR that counsel and the court told him that there "may" be deportation consequences as a result of his guilty plea but that no one told him with "guaranteed certainty" that he would be deported. He also testified that he did not consult an immigration lawyer prior to his guilty plea and that no one told him at that time that he should seek the advice of an immigration attorney. As already noted, we find that, on this record, there is no demonstration of prejudice here because the record at the time of the plea and sentencing evidences that immigration consequences would not have changed anything for defendant at the time.

As for the specific deficiencies of counsel asserted, we find that the record is a far cry from what was presented in *Nuñez–Valdéz*, where the defendant was materially interested in immigration consequences, and initially was assured, inaccurately, that his plea to drug charges would not result in such consequences, and substitute counsel, against that backdrop, only amended the advice to state that deportation was a possibility. Here, defendant did not receive wrong advice under existing law at the time. The immigration consequences were emphasized as real and beyond the control of the criminal justice system, and, most importantly, defendant's colloquy makes abundantly clear that the most impor-tant concern for him was the amount of time he would spend in prison. He emphasized in that specific context the lesser amount of time in the earlier pre-indictment offer, the number of children he had, including a recently born infant, and even his wife's recent health problems that caused him concern about his ability to care for her during a period of imprisonment.

Because *Padilla* is not entitled to retroactive application, we find no attorney violation of *Padilla*'s requirements in this matter. As for *Nuñez–Valdéz*, we find in this record no deficiency like what occurred in that matter, and we further conclude that Goulbourne has not demonstrated prejudice on this record.

VI.

As *Padilla* made clear, attorneys now have specific duties as to how they must advise pleading noncitizen criminal defendants, depending on the certainty of immigration consequences flowing from the plea. The Supreme Court articulated those duties as follows:

[A] criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.

[*Padilla, supra*, 559 *U.S.* at ——, 130 *S.Ct.* at 1483, 176 *L.Ed.*2d at 296.]

To the extent that *Padilla* holds that an attorney must tell a client when removal is mandatory—when consequences are certain—it represents a qualitatively new rule of expected attorney performance under *Strickland.* Prospectively from the time when the decision in *Padilla* was announced, counsel's failure to point out to a noncitizen client that he or she is pleading to a mandatorily removable offense will be viewed as deficient performance of counsel; affirmative advice must be conveyed as part of the counseling provided when a client enters a guilty plea to a state offense that equates to an aggravated felony, triggering eligibility for mandated removal. As highlighted by *Padilla* and in this opinion, due to changes to immigration laws, "if a noncitizen has committed a removable offense after the 1996 effective date of [the INA] amendments, his removal is practically inevitable...." *Padilla, supra*, 559 *U.S.* at ——, 130 *S.Ct.* at 1480, 176 *L.Ed.*2d at 292. It is thus particularly important now for criminal defense attorneys to be able to, at a minimum, secure accurate advice for their clients on whether a guilty plea to certain crimes will render them mandatorily removable.

To that end, numerous resources are available to help attorneys determine whether a state crime constitutes an aggravated felony under federal law. The Immigration Defense Project, for instance, provides online charts, freely available to the public, that assist in making that determination. *See* Immigrant Defense Project, *Quick Reference Chart for Determining the Immigration*

*Consequences of Selected New Jersey Criminal Offenses* (June 6, 2005), http://immigrantdefenseproject.org/wp-content/uploads/2011/02/NJ–Chart.pdf. And, as we were informed at oral argument in this matter, phone calls to attorneys at non-profit organizations, such as the Immigration and Legal Referral Pro Bono Project at the Law School at Rutgers–Camden, are yet another avenue through which criminal defense attorneys with noncitizen clients can gain information about aggravated felonies.

Moreover, even if removal is not "mandated" in the sense that a state offense is not identified on published lists of offenses equating to aggravated felonies or like mandatorily removable offenses, counsel must highlight for noncitizen clients that entering a guilty plea will place them at risk of removal and that they may seek to obtain counseling on potential immigration consequences in order that their guilty plea be accepted as knowing and voluntary. We will look to transcripts of plea colloquies for evidence that these points were placed on the record with a noncitizen defendant prior to a court's acceptance, and entry, of a guilty plea.

That said, as held in *Nuñez–Valdéz*, if counsel provided false information, or inaccurate and affirmatively misleading advice about removal consequences of a guilty plea, then deficiency may exist for purposes of establishing, at present, a prima facie ineffective assistance of counsel claim entitling defendant to an evidentiary hearing in a PCR proceeding. In determining eligibility for an evidentiary hearing in such circumstances, like others where a court may be confronted with competing affidavits between a client and counsel, we trust that courts will evaluate the sufficiency of a belated claim of misadvice before granting a hearing. In so doing, the court should examine the transcripts of the plea colloquy and sentencing hearing, as we have done in the present matters, to determine if either transcript provides support for an after-the-fact assertion that counsel failed to provide advice affirmatively sought by a client as to the immigration consequences of entering into a specific guilty plea, sufficient to justify an evidentiary hearing on the PCR claim.

## VII.

The judgment of the Appellate Division in *State v. Gaitan,* 419 *N.J.Super.* 365, 17 *A.*3d 227 (2011), is reversed and the judgment of the Appellate Division in *State v. Goulbourne* also is reversed. Both matters are remanded for disposition consistent with this opinion.

Justice ALBIN, dissenting.

Any minimally adequate criminal defense attorney in this State has known for more than a decade that a noncitizen client who is pleading guilty to a deportable offense must be advised of the immigration consequences of that plea. Therefore, the defense bar will be surprised to learn that—according to the majority—not until 2010 would attorneys "have known or expected . . . that they [must] advise noncitizen clients of the risk of immigration consequences" of a guilty plea. *Ante* at 370–72, 37 *A.*3d at 1107–08. The majority reaches this clearly erroneous conclusion by asserting that *Padilla v. Kentucky,* 559 *U.S.* ——, 130 *S.Ct.* 1473, 176 *L.Ed.*2d 284 (2010), placed a novel obligation on defense attorneys to provide advice—even minimal advice—to a client facing banishment as the result of pleading guilty to a deportable offense. *Ante* at 372, 37 *A.*3d at 1108. On that basis, the majority denies post-conviction relief to Frensel Gaitan, who was never advised by his attorney when he pled guilty to a drug offense in 2005 that he would or even might be deported from this country as a consequence of his guilty plea to an "aggravated felony." [1]

---

[1] For purposes of this appeal, we must accept as true the allegations in Gaitan's petition for post-conviction relief. Pursuant to 8 *U.S.C.A.* § 1101(a)(43)(B), an "aggravated felony" includes "illicit trafficking in a controlled substance"—a category of crime to which both defendants in this case have pled guilty. Since the 1996 amendments to federal immigration laws, conviction of an aggravated felony has meant mandatory deportation for noncitizen defendants. *See* 8 *U.S.C.A.* ˙§ 1227(a)(2)(A)(iii); *Padilla, supra,* 559 *U.S.* ——, 130 *S.Ct.* at 1480, 176 *L.Ed.*2d at 292.

The majority's decision cannot be reconciled with the very language of *Padilla*, which held that "[f]or at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea." 559 *U.S.* at ——, 130 *S.Ct.* at 1485, 176 *L.Ed.*2d at 297–98. The majority's decision is in direct conflict with the holding of the Third Circuit Court of Appeals in *United States v. Orocio*, 645 *F.*3d 630, 641 (2011), which concluded that *"Padilla* followed directly from ... long-established professional norms" and therefore was an " 'old rule' ... retroactively applicable on collateral review." The majority's decision turns a blind eye to American Bar Association Standard 14–3.2(f), adopted in 1999, which required defense attorneys to inform noncitizen clients of the immigration consequences of a guilty plea. The majority's decision ignores the reality that before 2005, through seminars and legal periodicals, defense attorneys in this State were instructed to advise noncitizen clients that a guilty plea to particular offenses carried the risk of almost certain deportation. Moreover, the majority's decision is inconsistent with the logic of legal precedents in this State. *See State v. Nunez–Valdez*, 200 *N.J.* 129, 139–42, 975 *A.*2d 418 (2009); *see also State v. Vieira*, 334 *N.J.Super.* 681, 688, 760 *A.*2d 840 (Law Div.2000). Even the judiciary's plea form, as adopted in 1988, acknowledged that a defendant's guilty plea might expose him to deportation.

Despite all of the above, the majority maintains that before the *Padilla* decision in 2010, defense counsel rendered effective representation under both our Federal and State Constitutions if they gave absolutely no advice to a client about the almost certain deportation consequences of a guilty plea. The majority's ruling will lead to state courts denying post-conviction relief in cases in which federal district courts, relying on the Third Circuit's decision in *Orocio*, will grant habeas corpus relief. The majority opinion may lighten the caseload of our court system, but only by achieving a result that is forbidden by the Sixth Amendment of the United States Constitution and by Article I, Paragraph 10 of the New Jersey Constitution. I therefore respectfully dissent.

## I.

## A.

Our courts have long held that both the Sixth Amendment and Article I, Paragraph 10 of our State Constitution guarantee the accused the "effective" assistance of counsel. *See State v. Savage,* 120 *N.J.* 594, 612, 577 *A.*2d 455 (1990); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). An attorney does not render constitutionally effective assistance if his "representation [falls] below an objective standard of reasonableness." *Strickland v. Washington,* 466 *U.S.* 668, 687–88, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984); *see Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336 (adopting *Strickland* standard under New Jersey Constitution).[2] "The proper measure of attorney performance remains simply reasonableness under *prevailing* professional norms." *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694 (emphasis added). The reasonableness of an attorney's representation may be judged by looking to prevailing norms as reflected in American Bar Association standards and other like guides. *Ibid.* Thus, the reasonableness of an attorney's performance "is necessarily linked to the practice and expectations of the legal community." *Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1482, 176 *L.Ed.*2d at 294. Significant to this case, the *Strickland* standard "applies to advice respecting a guilty plea." *Id.* at ——, 130 *S.Ct.* at 1485 n. 12, 176 *L.Ed.*2d at 297 (citing *Hill v. Lockhart,* 474 *U.S.* 52, 58, 106 *S.Ct.* 366, 370, 88 *L.Ed.*2d 203, 210 (1985)).

In determining whether Gaitan's attorney rendered constitutionally ineffective representation, we must be guided by the prevailing professional norms governing attorneys in 2005—the

---

2 Under *Strickland,* a conviction must be reversed for constitutionally ineffective representation only if a defendant can show (1) counsel's performance "fell below an objective standard of reasonableness," 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

time when Gaitan, with the assistance of counsel, entered a guilty plea to a drug offense. In 2005, the prevailing professional norms required counsel to advise a client entering a guilty plea ,to an aggravated felony that he was facing probable, if not mandatory, deportation. That point is made clear in *Padilla.*

### B.

In 2010, when the United States Supreme Court announced in *Padilla* that "counsel must inform her client whether his plea carries a risk of deportation," *id.* at ——, 130 *S.Ct.* at 1486, 176 *L.Ed.*2d at 299, it was not establishing a new rule, but rather acknowledging a well-recognized professional norm that existed at the time that Padilla entered his guilty plea in 2002. Indeed, the Court asserted that "[i]t is quintessentially the duty of counsel to provide [a criminal] client with available advice" on deportation issues. *Id.* at ——, 130 *S.Ct.* at 1484, 176 *L.Ed.*2d at 297. The Court discussed the sea change in federal immigration law in 1996 when Congress expanded the class of offenses to which mandatory deportation applied. *Id.* at ——, 130 *S.Ct.* at 1480, 176 *L.Ed.*2d at 292–93. The Court emphasized that the "severity of deportation—'the equivalent of banishment or exile,'—only underscores how critical it is for counsel to inform her noncitizen client that he faces a risk of deportation." *Id.* at ——, 130 *S.Ct.* at 1486, 176 *L.Ed.*2d at 298–99 (internal citation omitted).

Further, the Court observed that "[t]he weight of prevailing professional norms supports the view that counsel must advise her [noncitizen] client regarding the risk of deportation" by pleading guilty to certain offenses. *Id.* at ——, 130 *S.Ct.* at 1482, 176 *L.Ed.*2d at 294–95 (citing Nat'l Legal Aid & Defender Ass'n, *Performance Guidelines for Criminal Representation* § 6.2 (1995); G. Nicholas Herman, *Plea Bargaining* § 3.03 at 20–21 (1997); Gabriel J. Chin & Richard W. Holmes, Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas,* 87 *Cornell L.Rev.* 697, 713–18 (2002); Arthur W. Campbell, *Law of Sentencing* § 13:23 at 555, 560 (3d ed. 2004); 2 Dep't of Justice,

Office of Justice Programs, *Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance*, at D10, H8–H9, J8 (2000); ABA Standards for Criminal Justice, *Prosecution Function and Defense Function* 4–5.1(a) at 197 (3d ed. 1993); ABA Standards for Criminal Justice, *Pleas of Guilty* 14–3.2(f) at 116 (3d ed. 1999)). Those established professional norms all preceded Gaitan's 2005 guilty plea. The Court also recognized that "authorities of every stripe—including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications—universally require defense attorneys to advise as to the risk of deportation consequences for noncitizen clients." *Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1482, 176 *L.Ed.*2d at 295 (internal quotation marks omitted).[3] Thus, for at least fifteen years before the *Padilla* decision, an attorney's silence was "fundamentally at odds with the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement." *Id.* at ——, 130 *S.Ct.* at 1484, 1485, 176 *L.Ed.*2d at 296, 297–98 (internal quotation marks omitted).

Justice Alito concurred with the five-person majority, differing only on the nature and extent of advice that is required of counsel. He concluded that "[w]hen a criminal defense attorney is aware that a client is an alien, the attorney should advise the client that a criminal conviction may have adverse consequences under the immigration laws and that the client should consult an immigration specialist if the client wants advice on that subject." *Id.* at ——, 130 *S.Ct.* at 1494, 176 *L.Ed.*2d at 307 (Alito, J., concurring).

---

[3] In particular, it is worth mentioning that in 1999 the American Bar Association adopted Standard 14–3.2(f) requiring defense counsel to "advise the defendant, sufficiently in advance of the entry of any plea, as to the possible collateral consequences that might ensue from entry of the contemplated plea." *Pleas of Guilty, supra,* 14–3.2(f). One such collateral consequence identified was the immigration consequences to a noncitizen who pleads guilty. *Id.* at 126–27. As explained in the Standard's commentary, "it may well be that many clients' greatest potential difficulty, and greatest priority, will be the immigration consequences of a conviction." *Id.* at 127.

Thus, "silence alone is not enough to satisfy counsel's duty to assist the [noncitizen] client" in accordance with the Sixth Amendment. *Ibid.* Indeed, Justice Alito observed that "any competent criminal defense attorney should appreciate the extraordinary importance that the risk of removal might have in the client's determination whether to enter a guilty plea." *Ibid.* The majority and concurrence agreed on one essential point—an attorney does not fulfill his constitutional obligation by complete silence.

Because the majority holds that criminal defense attorneys were not required to give affirmative advice on deportation consequences until *Padilla,* the majority obviously has concluded that the United States Supreme Court established the now prevailing professional norm in 2010. But if that were the case, then had *Padilla* never been appealed to the United States Supreme Court, defense attorneys even today could remain silent about the dire immigration consequences of a guilty plea without offending professional norms. However, the bar does not await pronouncements from the United States Supreme Court before establishing minimally acceptable codes governing the professional conduct of attorneys.

## C.

Significantly, the Third Circuit Court of Appeals in *United States v. Orocio,* came to the unremarkable conclusion that *Padilla* retroactively applied to the 2004 guilty plea entered in that case. 645 *F.*3d at 639–41. The Third Circuit held that "*Padilla* broke no new ground in holding the duty to consult also extended to counsel's obligation to advise the defendant of the immigration consequences of a guilty plea and did not yield[ ] a result so novel that it forge[d] a new rule." *Id.* at 639–40 (internal quotation marks omitted). Thus, "[w]hen Mr. Orocio pled guilty, it was 'hardly novel' for counsel to provide advice to defendants at the plea stage concerning the immigration consequences of a guilty plea, undoubtedly an 'important decision' for a defendant." *Id.* at 639. "[B]ecause *Padilla* followed directly from *Strickland* and

long-established professional norms," the circuit court found it to be an "old rule" and therefore retroactively applicable to Orocio on collateral review. *Id.* at 641.

The majority rightly indicates that the federal circuit courts of appeal have split on the issue of the retroactivity of *Padilla.*[4] The majority suggests that the conflicting interpretations among courts about the retroactive effect of *Padilla* indicate that *Padilla* enunciated a new rule. However, a new rule of law is not born merely because some jurisdictions have clearly misconstrued a mandate of the United States Supreme Court.

The majority has adopted the reasoning of the Seventh Circuit in *Chaidez v. United States,* 655 *F.*3d 684, 689 (7th Cir.2011)—and rejected that of the Third Circuit—in denying application of *Padilla* to defendants seeking post-conviction relief for violation of the Sixth Amendment right to effective assistance of counsel. *Chaidez* purports that *Padilla* established a new rule. *Id.* at 686. For the reasons expressed in this opinion, I believe that the Third Circuit has come to the correct conclusion. Concededly, the New Jersey Supreme Court is not bound to follow decisions of the Third Circuit with which it disagrees. *See Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 79–80, 577 *A.*2d 1239 (1990). However, the federal district court judges in the District of New

---

[4] This discord stems from the divergent application of *Teague v. Lane,* 489 *U.S.* 288, 109 *S.Ct.* 1060, 103 *L.Ed.*2d 334 (1989), which defines the contours of retroactivity in terms of "old rules" and "new rules." In general, "old rules" are applied retroactively, while "new rules," said to "break[ ] new ground or impose[ ] a new obligation on the States or the Federal Government," "will not be applicable to those cases which have become final before the new rules are announced." *Id.* at 301–10, 109 *S.Ct.* at 1070–75, 103 *L.Ed.*2d at 349–56. The Third Circuit determined that the professional standards articulated in *Padilla* were "old rules" because they merely "reaffirmed defense counsel's obligations to the criminal defendant during the plea process." *Orocio, supra,* 645 *F.*3d at 638. The Seventh and Tenth Circuits, on the other hand, rely primarily on the inconsistency with which lower federal and state courts have ruled on defense counsel's obligations to noncitizen clients in concluding that *Padilla* announced a new rule of law. *See Chaidez v. United States,* 655 *F.*3d 684, 689 (7th Cir.2011); *United States v. Chang Hong,* No. 10–6294, 2011 *WL* 3805763, 671 *F.*3d 1147, 1153–54 (10th Cir. Aug. 30, 2011).

Jersey will follow the precedents of the Third Circuit, not this Court. The result will be that in cases in which the failure to advise a client of the deportation consequences of a plea led to a defendant mistakenly pleading guilty, state court judges will deny post-conviction relief only to have their decisions overridden on habeas corpus review. On habeas corpus, the federal district courts will not consider themselves bound by an erroneous interpretation of *Padilla* by the New Jersey Supreme Court. This will not be the first time that we have been faced with the consequences of mutually conflicting decisions by the Third Circuit and this Court.[5]

## D.

Beyond *Padilla* and *Orocio*, there is much other evidence indicating the professional norms applicable to defense attorneys representing noncitizen clients in 2005. Before the *Gaitan* plea, New Jersey attorneys were informed at seminars and in legal publications about their professional obligation to advise a noncitizen client of the deportation consequences of a guilty plea.

In 2003, the *New Jersey Law Journal* published an article reporting on "a recent seminar in Newark sponsored by the state Office of the Public Defender and the New Jersey Association of Criminal Defense Lawyers," during which lawyers were warned that they "had better know the ins and outs of how highly detailed immigration law might be hanging menacingly over some of their

---

[5] In *Humanik v. Beyer*, 871 F.2d 432, 441–43 (3d Cir.), *cert. denied*, 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), the Third Circuit found that a jury charge that shifted the burden of proof to a defendant asserting a diminished-capacity defense—a charge approved by this Court in *State v. Breakiron*, 108 N.J. 591, 532 A.2d 199 (1987)—violated the defendant's due-process rights. The decision of the Third Circuit was not binding on New Jersey courts. Nevertheless, the Court (per Chief Justice Wilentz) issued a memorandum to all trial court judges, effectively directing them to disregard *Breakiron* in order "not to jeopardize State criminal trials by the threat of federal habeas reversals." *State v. Reyes*, 140 N.J. 344, 357, 658 A.2d 1218 (1995) (internal quotation marks omitted).

clients' heads." MichaelAnn Knotts, *NJSBA Annual Meeting Preview*, *N.J.L.J.*, May 5, 2003, at A6. Experts in the field of criminal law stressed that "[f]ailure to recognize the potential consequences of a criminal disposition involving an immigrant and so informing that person may constitute a violation of Standard 14–3.2(f) of the American Bar Association's Standards for Criminal Justice Pleas of Guilty." *Ibid.* Those attending the seminar—and reading the *Law Journal*—were told that they were obliged to discuss the immigration consequences of a plea with their clients. *Ibid.*

The views expressed at the seminar and in the *New Jersey Law Journal* article were not at the cutting edge or in any way novel. They merely reflected the prevailing professional norms of the time. *See* Jim Edwards, *Avoiding a Plea That's No Bargain; Ignorance of the Immigration Effect of a Criminal Conviction Can Get a Noncitizen Client Deported Fast, With Little or No Relief Available*, *N.J.L.J.*, September 23, 2002, at 19 ("For aliens, even those legally in the United States, conviction-triggered deportation proceedings are far more serious than a criminal record or a spell in prison."); Robert Frank, *Immigration Consequences of Criminal Acts*, *New Jersey Lawyer*, February 2005, at 25 ("To adequately represent the alien in criminal proceedings, it is essential to thoroughly understand the impact that the crimes charged, the sentence imposed and the resolution of the proceeding will have on the alien's status."); *cf.* Laurie L. Levenson, *Representing Aliens*, *N.J.L.J.*, May 17, 1999, at 37 ("Defense counsel who represent clients who have either violated the immigration laws or whose convictions affect their immigration status have added responsibilities in providing such representation.").

E.

Our State's case law also indicates that, before 2005, defense attorneys were on notice of their obligation to advise a noncitizen client of the deportation consequences of a guilty plea. In *State v. Vieira*, 334 *N.J.Super.* 681, 688, 760 *A.*2d 840 (Law Div.2000), a

respected trial court judge wrote that an attorney's representation "is constitutionally deficient if the attorney does not address the issue of deportation with the [noncitizen] defendant and the defendant is not aware of the risk of deportation."

*State v. Nunez–Valdez*, 200 *N.J.* 129, 975 *A.*2d 418 (2009), also lends strong support for the proposition that professional norms in 2005 required counsel to advise a client of the immigration consequences of a plea. In 1998, the defendant in *Nunez–Valdez* pled guilty to the fourth-degree crime of criminal sexual contact and was sentenced to a five-year probationary term. *Id.* at 132, 975 *A.*2d 418. As a result of his guilty plea, the defendant was deported to the Dominican Republic. *Ibid.* We granted the defendant post-conviction relief because his attorneys provided him with "misleading or false information about immigration consequences" of his guilty plea. *Id.* at 142, 975 *A.*2d 418. In particular, we found that the misinformation denied the defendant his right to effective assistance of counsel under the New Jersey Constitution. *Id.* at 141–43, 975 *A.*2d 418.

We did not rest our analysis on whether deportation is a penal or collateral consequence of a criminal conviction, but simply on whether counsel rendered ineffective assistance by "provid[ing] misleading, material information that results in an uninformed plea." *Id.* at 139–40, 975 *A.*2d 418. We looked at the federal immigration statutes in effect in 1998 and determined that the defendant pled to an offense that constituted an aggravated felony under federal law requiring mandatory deportation. *Id.* at 140, 975 *A.*2d 418. In concluding that counsel was not permitted to misinform his client about immigration consequences, we in no way suggested that the then-professional norms would have excused counsel from saying nothing at all on the subject. From the viewpoint of the defendant in *Nunez–Valdez*, he would have been just as disadvantaged if his attorneys remained silent about the deportation consequences of his guilty plea.

That is why the Court in *Padilla* did not confine its ruling to cases involving only misinformation. As the Court observed:

A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available.... Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available.

[*Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1484, 176 *L.Ed.*2d at 296–97.]

## F.

Another clear indication that professional norms in 2005 required counsel to provide advice on immigration consequences is the court-mandated plea form that counsel and defendants have been completing since 1988 in New Jersey. Beginning on January 5, 1988, a defendant, with the assistance of counsel, was required to circle "Yes," "No," or "N/A" to the following question on the written plea form submitted to the trial court: "Do you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?" *See* Administrative Directive #1–1988 (Jan. 15, 1988).[6] Despite this 1988 administrative directive, the majority declares that professional norms entitled counsel to remain silent on the immigration consequences of a guilty plea, except when the defendant appears before the court to answer the sole immigration question on the plea form. Surely, defense counsel has a greater obligation than the court to make certain the accused is informed of the material consequences of a plea of guilty.

## II.

For the period before 2010, the majority insists on perpetuating the absurd distinction condemned in *Padilla.* The majority will allow claims for ineffective assistance of counsel when an attorney misinformed a client about the deportation consequences of a guilty plea and deny such claims when the attorney provided no advice at all to a client who desperately needed to know that his

---

[6] That question has been amended several times since 1988 to make more clear that immigration consequences may flow from a plea of guilty.

plea would result in banishment from his home and separation from his family. The majority highlights the fact that after the 1996 amendments to various immigration laws the removal of a noncitizen who pleads guilty to certain offenses " 'is practically inevitable.' " *Ante* at 360, 37 *A*.3d at 1101 (quoting *Padilla, supra,* 559 *U.S.* at ——, 130 *S.Ct.* at 1480, 176 *L.Ed.*2d at 292). With that reference to the 1996 amendments, the majority concludes that it is "particularly important *now* for criminal defense attorneys to be able to, at a minimum, secure accurate advice for their clients on whether a guilty plea to certain crimes will render them mandatorily removable." *Ante* at 380, 37 *A*.3d at 1113 (emphasis added). But then why was it not important in 2005, nine years after the effective date of the amendments, for a noncitizen to receive advice about the immigration consequences of a plea?

*Padilla* referred to the applicable constitutional standard guiding counsel in providing advice to a noncitizen on the immigration consequences of a plea. It is not an overly onerous burden given the stakes. *Padilla* instructs that for Sixth Amendment purposes:

> When the law is not succinct and straightforward ... a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.

[*Id.* at ——, 130 *S.Ct.* at 1483, 176 *L.Ed.*2d at 296.]

The overwhelming evidence presented here shows that this quotation merely encapsulates the prevailing professional norms in 2005. An attorney not acting in accordance with those professional norms was not acting reasonably in 2005.

## III.

In 2005, Gaitan, a lawful permanent resident, pleaded guilty to a deportable drug offense—an aggravated felony—under the Immigration and Nationality Act. *See* 8 *U.S.C.A.* §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii). Gaitan averred in his petition for post-conviction relief that his counsel failed to advise him that any immigration

consequences would result from the conviction. Although Gaitan was sentenced to a five-year probationary term, he was deported in 2008 as a consequence of his conviction. Gaitan has alleged that his counsel was constitutionally deficient under *Strickland* and *Padilla.*

I agree with the Appellate Division that Gaitan "was entitled to an evidentiary hearing" to determine what, if any, advice his attorney gave him "regarding his potential removal from the country." *State v. Gaitan,* 419 *N.J.Super.* 365, 370, 17 *A.*3d 227 (App.Div.2011). However, even if a PCR court determined that counsel was deficient in not providing advice on the immigration consequences of the plea, Gaitan would still be required to show that he would not have accepted the plea "but for counsel's unprofessional errors." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.[7]

## IV.

In conclusion, contrary to the Sixth Amendment right to the effective assistance of counsel, *Strickland,* and *Padilla,* for cases involving noncitizens who entered guilty pleas before 2010, the majority opinion tolerates attorney performance that falls well outside the wide range of acceptable professional conduct. For those who entered guilty pleas before 2010 without having a proper understanding of the deportation consequences and who would not have pled guilty had they been adequately informed, no remedy will be afforded in our State courts. But based on *Orocio,* relief may be available on federal habeas corpus review.

I believe that in 2005, based on the then-professional norms, defense counsel had, at the very least, an obligation to inform their

---

[7] In the companion case of *Goulbourne,* it appears that the defendant was sufficiently apprised of the immigration consequences of his guilty plea by the trial judge. Nevertheless, I would remand to the PCR court, which applied the incorrect standard in rendering a decision on Goulbourne's post-conviction relief application.

noncitizen clients that a guilty plea carried the risk of adverse immigration consequences, including deportation. Accordingly, *Padilla* did not create a new constitutional rule but merely acknowledged that "reasonableness under prevailing professional norms" was the measure for determining whether an attorney's performance was constitutionally deficient. *See Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. Because the majority wrongly denies Gaitan the retroactive application of *Padilla,* I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER, Justices LaVECCHIA, HOENS and PATTERSON, and Judge WEFING (temporarily assigned)—5.

*For affirmance*—Justices LONG and ALBIN—2.