**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3754-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RODNEY F. BATES, a/k/a
RODNEY F. BATES, JR.,

     Defendant-Appellant.

_____

Argued November 28, 2023 – Decided February 13, 2024

Before Judges Gooden Brown and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-12-3508.

Kayla Elizabeth Rowe, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Kayla Elizabeth Rowe, on the brief).

Maura Murphy Sullivan, Assistant Prosecutor, argued the cause for appellant (Grace C. MacAuley, Camden County Prosecutor, attorney; Maura Murphy Sullivan, of counsel and on the brief).

PER CURIAM

Defendant Rodney F. Bates appeals from a July 8, 2022 order denying his first petition for post-conviction relief (PCR) without a hearing. Having reviewed the record and defendant's arguments in light of the applicable law, we affirm.

I.

We glean the following facts from our prior opinion on defendant's direct appeal, State v. Bates, No. A-0373-17 (App. Div. June 10, 2019) (slip op. at 6-12), and from our review of the record. Defendant's elderly mother lived in Somerdale with her daughter, who was defendant's sister; and her granddaughter, who was defendant's niece. Defendant's mother had deeded the home to his sister in July 2004, and his sister and niece cared for his mother.

Defendant was not permitted to enter the home unless his sister was present, and had to make an appointment to do so. He was allowed to use the detached garage, where he stored some of his belongings. The niece described him as, among other things, "a little bit of a bully to everybody in the family including [his mother]." She also testified that defendant never came to the home when she was alone with his mother, because the niece felt uncomfortable around him. She explained she usually kept the doors locked to keep defendant

2

out, because when he came in, he would refuse to leave or display a "bully kind of mentality." She also said defendant had previously locked her out of the house.

On the morning of September 10, 2015, defendant's sister was not home and his niece was caring for his mother. As the niece ran out of the house to take out the trash, defendant pulled up in his mother's Cadillac and began to ridicule her. He got out of the car and started "gunning" for the door, which she had left unlocked. She pleaded with him not to go in the house, because he was not allowed in, but he did so anyway. She ran behind him and grabbed the doorknob. Defendant reached for the slide lock but she "ripped" open the door and stood in between him and the door so that he would not lock her out of the house. Defendant pushed his body into hers, which propelled her against the door, shattering the glass. He picked up a piece of triangular-shaped glass and held it near her.

Defendant and his niece then struggled, during which he grabbed a fistful of her hair at the top of her head, causing clumps of her hair to come out. The niece fell to the ground, and he jumped on top of her and pinned her down with his hands. She cried and screamed, and eventually stood up. She was able to get into the house, retrieve her cell phone, and call 9-1-1.

A-3754-21

Defendant re-entered the house and went to his mother's room, where the niece heard him attempting to blame her for the broken door. As the niece was speaking to the 9-1-1 dispatcher, defendant returned and grabbed her by the neck, pinned her against the wall, and punched her in the face twice. His mother then came out of her room using her walker.

The niece called 9-1-1 again, having been disconnected from the first call, and defendant left. Recordings of the two 9-1-1 telephone calls were played for the jury. In the first call, the niece told the dispatcher: "My uncle just broke into the house. We were just wrestling outside. He broke the glass. . . . He's coming after me right now. . . . He just punched me." During the second call, she said defendant had her "pinned under the chair pounding [her] in the face." In the second call, in response to the dispatcher's question, "what's going on there," the niece responded: "I have an abusive, crazy uncle who stops by from time to time. Today he decided to break the glass [on] my grandmother's porch, break in and then proceeded to punch me in the face and pull my hair."

At trial, the State presented the jury with photographs including the shattered door, clumps of the niece's hair and her two black eyes.

Defendant testified to a different version of events. He said he was unaware of any understanding among his mother, sister, and niece that he was

4

not allowed to enter the house unless his sister was present. According to him, the opposite was true; his mother wanted him there. He said he had no idea his mother had deeded the home to his sister until he saw the deed a couple of days before trial when he and his attorney were reviewing discovery.

Turning to the events of September 10, 2015, defendant said he drove to his mother's home that morning to visit her. He drove into the driveway, passed his niece, who was taking out the trash, and walked toward the door. He thought he heard his niece say something but told her he did not have time and continued to walk toward the door. Defendant said as he began to open the door to enter the home to see his mother, his niece came from behind him, slipped under his arm, and got between him and the door. According to defendant, her hair got caught in the latch and lock and she thought he was pulling it. She stomped on his foot three times and broke his toe. In pain, he lifted his foot, and she pushed him to the ground. As he lay on the ground he watched his niece rip her hair out from the lock, screaming "ouch" as she did so. She then tried to kick him again.

Defendant had to hop into the house to see his mother, because his foot was severely injured. He told his mother his niece was starting something and asked his mother to come out of her room and intercede, and his mother came out.

5

It appeared to him that his niece was getting a knife out of a kitchen drawer, so he told his mother he was leaving and he left, wanting to get away from his attacker. Defendant repeated that he had gone to the home for no other reason than to visit his mother. He explained that he lives in Florida during the winter, and when summer is over, he returns there. He knew his mother's health was failing and wanted to visit her before returning to Florida for the winter.

During cross-examination defendant was confronted with photographs of his niece's injuries, which he denied inflicting. He said the photographs of her face looked "like all smeared makeup." As to her other injuries, he testified, "I feel as though she inflicted them upon herself by attacking me from behind and putting her head in a position where her hair was caught and the way she ripped her hair out." Defendant claimed he never touched her, insisting he was "not responsible for her actions. She was the aggressor, not [him]."

The jury rejected defendant's version of the events and convicted him of second-degree burglary of his sister's home and third-degree aggravated assault on his niece. At sentencing, the court merged the aggravated assault into the burglary and sentenced defendant to a ten-year custodial term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed the conviction but remanded to the trial court to correct the judgment of conviction to reflect the

6

burglary as it was charged in the indictment, which was a third-degree offense, and for resentencing on that count.  On remand, the court resentenced defendant to a five-year custodial term with a two-and-a-half-year parole ineligibility period.

Defendant again appealed to the excessive sentence oral argument panel, which remanded the matter again for resentencing to afford defendant the opportunity to speak at sentencing.  After a denied motion for release, which we affirmed, defendant filed a pro se PCR petition in September 2019, but withdrew it; counsel filed a certification and brief in March 2022.

In his petition, defendant argued his trial counsel rendered ineffective assistance by failing to do the following:  properly investigate and ensure that all Brady[1] materials were received, object to or investigate the origin of a photograph depicting the victim with two black eyes, verify the DNA found on the niece's pants was defendant's, investigate and cross-examine defendant's mother's caregiver, interview and question the ambulance driver prior to her testimony, and object to the admission of the 9-1-1 calls.

The PCR judge issued an oral decision on the record, discussed more fully below, denying defendant's petition without an evidentiary hearing because he

---

[1]  Brady v. Maryland, 373 U.S. 83 (1963).

A-3754-21

"failed to establish a prima facie case of ineffective assistance of counsel for any of the errors raised in [his] petition." The court did not find "counsel committed such cumulative errors as to render the defendant's trial unfair or deprive him of his Sixth Amendment right to counsel," and denied defendant's request for an evidentiary hearing.

## II.

Defendant raises the following points on appeal:

POINT I.

THERE WERE MATERIAL ISSUES OF FACT WITH RESPECT TO THE UNPRODUCED SMITH REPORT THAT SHOULD HAVE BEEN RESOLVED WITH LIMITED PCR DISCOVERY AND AT AN EVIDENTIARY HEARING.

POINT II.

THE PCR COURT SHOULD HAVE HELD AN EVIDENTIARY HEARING TO ANSWER ITS QUESTIONS ABOUT [DEFENDANT'S] PRO SE CLAIM THAT COUNSEL FAILED TO HAVE THE BLOOD TESTED.

POINT III.

THE PCR COURT FAILED TO ANALYZE [DEFENDANT'S] ARGUMENT THAT HAD THE JURY KNOWN HE WAS INJURED IN THE MELEE, IT WOULD HAVE CHANGED THE OUTCOME OF THE TRIAL.

We are unpersuaded by defendant's contentions.

## III.

We review the legal conclusions of a PCR court de novo. State v. Harris, 181 N.J. 391, 419 (2004) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). The de novo standard also applies to mixed questions of law and fact. Ibid. Where an evidentiary hearing has not been held, we "conduct a de novo review of both the factual findings and legal conclusions of the PCR court . . . ." Id. at 421.

To succeed on a claim of ineffective assistance of counsel, a defendant must establish both prongs of the test set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987), by a preponderance of the evidence. State v. Gaitan, 209 N.J. 339, 350 (2012). First, a defendant must show that "counsel's performance was deficient." Strickland, 466 U.S. at 687. This requires demonstrating that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Ibid. The Constitution requires "reasonably effective assistance," so an attorney's performance may not be attacked unless they did not act "within the range of competence demanded

of attorneys in criminal cases" and instead "fell below an objective standard of reasonableness." Id. at 687-88.

When assessing the first Strickland prong, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight." Id. at 689. "Merely because a trial strategy fails does not mean that counsel was ineffective." State v. Bey, 161 N.J. 233, 251 (1999) (citing State v. Davis, 116 N.J. 341, 357 (1989)). Thus, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]" and "the defendant must overcome the presumption that, under the circumstances, the challenged action [by counsel] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Further, the court must not focus on the defendant's dissatisfaction with "counsel's exercise of judgment during the trial . . . while ignoring the totality of counsel's performance in the context of the State's evidence of [the] defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006).

For the second prong of the Strickland test, "the defendant must show that the deficient performance prejudiced the defense." 466 U.S. at 687. This means

10

"counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Ibid.

"[I]n order to establish a prima facie claim, a petitioner must do more than make bald assertions that he was denied the effective assistance of counsel." State v. Cummings, 321 N.J. Super. 154, 170 (1999). "[R]ather, the defendant 'must allege facts sufficient to demonstrate counsel's alleged substandard performance.'" State v. Jones, 219 N.J. 298, 312 (2014) (citations omitted) (quoting State v. Porter, 216 N.J. 343, 355 (2013)). Where a "court perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to [PCR] . . . or that the defendant's allegations are too vague, conclusory, or speculative to warrant an evidentiary hearing . . . then an evidentiary hearing need not be granted." State v. Marshall, 148 N.J. 89, 158 (1997) (citations omitted); see R. 3:22-10(e)(1)-(2).

Guided by these standards, we find the PCR court did not err in denying defendant's petition. We address defendant's arguments in turn.

First, defendant argued his counsel was ineffective because he failed to properly investigate and ensure that all Brady materials were received. Specifically, defendant claimed an Officer Smith wrote a report containing exculpatory information, which defendant first learned about during his direct

11

appeal. According to defendant, the report stated the glass from his mother's door had broken outward instead of inward; thus, defendant believed this information would exculpate him of the burglary charge.

The record reflects that the discovery request for the report was discussed during a pretrial conference on October 11, 2016. Defendant's counsel asked for any "statements" made by Officer Smith, because his investigators reached out to the officer and he was "not providing any statement," nor was there "any indication there [was] an original statement." The judge asked for clarification, since in her experience, she had never seen a police officer provide a "statement" in a criminal matter, rather, an officer may write a report. Defense counsel agreed that he meant to ask for any police report authored by Officer Smith. The assistant prosecutor responded that his detective had called the Somerdale records clerk twice to determine whether there were any reports from Officer Smith, and informed the court "[t]hey do not exist; there's nothing." The court concluded that there was no report, to which defendant responded, "Yes, Your Honor. Thank you for that information."

We agree with the PCR judge's finding there was no need to conduct discovery because defendant did not produce any evidence of a report written by Officer Smith. Defendant referenced the pretrial memorandum included in

12

the State's appendix on direct appeal, which lists the report as "needed discovery." Defendant interpreted this notation to mean that a report existed. However, as the PCR judge found, the pretrial memorandum catalogued discovery that had been requested, but did not confirm the existence of the report.

Moreover, defendant did not demonstrate counsel failed to adequately investigate the issue in his defense. During the pretrial conference, the State confirmed on the record that it had investigated the request and determined there was no report. The court accepted that representation, and defense counsel's reliance on that representation did not fall below the standards of objective reasonableness.

Defendant's claim that the report was exculpatory is also dubious. The jurors were shown photographs of the door and were charged with making the determination of which witnesses were credible. The niece testified that defendant was already in the doorway of the house when she put herself in between him and the door so he could not lock her out. She said defendant then shoved her into the door, which ended up "smashing." She testified, "The glass was everywhere including where my bare feet were. I remember looking down and seeing shards of glass but [thought] I'm not giving up my ground, I'm not

13

getting locked out of the house in this drizzle rain in my pajamas, that's not going to happen." Because the testimony and evidence at trial were consistent with there being glass on the outside of the house, a report confirming that fact would not have been exculpatory.

Second, defendant argues the PCR judge erred by not conducting an evidentiary hearing to determine whether defendant asked his counsel to test the blood on the victim's clothing. As reflected in the record, defendant did not provide any proof that he raised the issue with trial counsel nor any evidence in the form of affidavits or certifications that any blood present on the niece's pants would have been favorable to him. The PCR judge found:

> Evidence and testimony were presented to the jury that the defendant and the victim struggled with one another during a physical altercation. Specifically, the defendant testified that during the altercation [he] sustained injuries.
>
> The presence of the defendant's blood does not change the fact that the parties physically struggled and the defendant was injured, facts that the jury already knew. Assuming that the defendant actually did request the DNA testing, trial counsel's decision to forego requesting DNA testing of the blood was not unreasonable.

For the reasons articulated by the PCR judge, we agree that a hearing was not warranted.

14

Lastly, defendant argues the PCR judge did not address his contention that his trial counsel failed to adequately present his injuries to the jury, which may have resulted in a different outcome. We disagree. In outlining the issues raised by defendant, the PCR judge stated, "Additionally, the defendant asserts that if the jury knew he was also injured the outcome of the trial would have been different. The defendant does not offer any additional facts, assertions or law to support this claim." In his discussion of the DNA, the PCR judge noted defendant testified about his injuries, which the trial transcript reflects:

> My niece came up behind me. When I opened the door with my right hand she slipped under my arm and got in between me and the door. Her hair got caught in the latch and lock and she thought I was pulling her hair and she stomped on my foot three times, broke my toe. I picked my foot up in pain and I was pushed to the ground. And I skinned my elbow on the way down, hurt my hip, and I later found out that I broke my—or she broke my toe, causing all the rest of the injuries including the broken toe.

Defendant's petition did not point to any injury he sustained that was not presented to the jury through his own testimony. While he claimed counsel perhaps should have retained an expert to examine the extent of his nerve damage, he did not demonstrate that counsel's performance in this regard was so deficient that it prejudiced the outcome of the trial.

A-3754-21

Because defendant failed to meet either prong of <u>Strickland</u> on any of his claims, the PCR judge did not err in denying a hearing.

To the extent we have not expressly addressed any issues raised by defendant, it is because they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3754-21