# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3042-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ARSENIO AMELCO, a/k/a
ALEXIS AMELCO,

    Defendant-Appellant.

_____

Submitted April 2, 2025 – Decided July 3, 2025

Before Judges Marczyk and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-12-1631.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Deepa S. Y. Jacobs, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Arsenio Amelco appeals from the Law Division's April 24, 2023 order denying without a hearing his petition for post-conviction relief (PCR), claiming his defense counsel was ineffective for failing to (1) object to the State's late production of discovery and (2) present at trial allegedly exculpatory statements the victim made to her mother. After reviewing the record de novo in consideration of defendant's arguments, we affirm.

I.

In 2017, we affirmed defendant's conviction by a jury of two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(6); one count of third-degree aggravated assault causing significant bodily injury, N.J.S.A. 2C:12-1(b)(7); three counts of third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a); one count of third-degree criminal restraint, N.J.S.A. 2C:13-2; one count of third-degree terroristic threats, N.J.S.A. 2C:12-3(b); and one count of fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2). See State v. Amelco, No. A-3659-14 (App. Div. Jan. 23, 2017) (slip op. at 2-3). We remanded for re-sentencing, resulting in the imposition of an aggregate term of twenty-six years' incarceration with an eighty-five percent term of parole ineligibility subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed that sentence on appeal.

2

A.

We derive the following facts regarding the offense from the trial record as described in detail in our decision on direct appeal. A year after defendant and the victim, Melissa,[1] ended their seven-month dating relationship, the two went to dinner in July 2013 for defendant's birthday. They arrived by taxi to a waterside restaurant where they first "argue[d] on the outside boardwalk for approximately two hours," during which "defendant . . . pick[ed] [Melissa] up and dangl[ed] her over the water." Id. at 5. The two eventually went to the restaurant bar and consumed wine and a shot of tequila. When they left to go home, they headed to an outdoor "enclosure" to wait for a ride, when, as Melissa recounted, defendant "pulled her into a dark part of the enclosure and took her cell phone." Id. at 6.

She recalled defendant took off his belt while asking her "why she never trusted him or gave him a second chance." Ibid. He called her "an idiot and demanded she undress." Ibid. Melissa feared he would "choke her with his belt," but refused to undress as defendant undressed himself. Ibid. As defendant began undressing her, Melissa resisted, and "he pushed her to the ground and

---

[1] As we did on direct appeal, we refer to the victim by a pseudonym to protect her privacy.

A-3042-22

started trying to remove her underwear." Ibid. When she heard a car, Melissa screamed and defendant began "chok[ing] her with both hands." Melissa stopped screaming, fearing defendant would kill her if she continued. Ibid.

We previously summarized Melissa's testimony regarding the sexual assault that followed:

> They were both naked at this point. Defendant began kissing Melissa's mouth, neck, and breasts. When defendant started performing cunnilingus, she said "no, please;" he then threatened to kill her three times. Eventually, he laid back with his eyes closed and arms open, and said, "Devil, show me . . . how to work with you. Show me what to do now." Melissa thought he was going to strangle her. She looked for her phone but could not find it. In order to calm him down, she asked him whether they were going to get married. He said yes, and "we're going to have kids."
>
> Defendant climbed back on top of Melissa, held her down with his arm, kissed her everywhere, and started trying to penetrate her with his penis. She felt painful pressure in her vagina. She tried to push defendant back and put her hand in front of her vagina, but defendant persisted. She reiterated they were going to get married and tried to explain it was not the right moment, but defendant said, "[T]he only way that you will get out of my hands right now [is] if you allow me to penetrate you."
>
> Melissa still refused to let defendant penetrate her. He reiterated his ultimatum, so she pushed him with her feet. When he noticed she was looking for her phone, he asked her whether she thought he was stupid enough to let her get it. She asked him to let her go

4

because her mom was worrying about her. He said, "I don't care. I'm going to kill you 'cause you never give me a second chance." Melissa started to look around for help, and defendant told her not to bother because no one ever came near this area.

By this point, the sun began to rise. Melissa repeated her request for defendant to let her go, so she could call her mom. He said, "[N]o. I'm going to kill you and your Mom is going to feel the pain." She asked to get dressed, and he again refused. When she screamed, he jumped onto her and choked her with both hands. She kicked him and tried to take his hands off her neck without success. She stopped screaming, so he stopped choking her.

[Id. at 6-8 (alterations in original).]

Defendant instructed Melissa to call and inform her mother that they "got drunk . . . [and] went to a friend's house." Id. at 8. Defendant then told Melissa she was "going to die," and defendant might kill himself. Ibid. He "forced Melissa to bend her knees . . . [and] started choking her. Then he punched her in the face with his right fist," breaking her nose. Ibid. Melissa described defendant then calling a friend to drive them home and saying he "almost killed [Melissa]." Ibid. (alteration in original). When the friend arrived and saw Melissa covered in blood, he asked defendant what he had done, and said she needed to be taken to the hospital. The friend then drove her home.

Melissa's mother saw Melissa covered in blood, and Melissa confirmed defendant hurt her, so they proceeded to the local police station, from which police transported her to the Edgewater Police Department to report the attack. Edgewater police then took her to the local hospital for a forensic medical examination after contacting the Special Victims' Unit of the Bergen County Prosecutor's Office. At the hospital a sexual assault nurse examiner and rape crisis advocate examined Melissa. The examination

> revealed a swollen and bruised eye, an abrasion to the right side of the forehead, a bruise to the forehead, abrasions to the nose and above the upper lip, an abrasion under the eye and chin, bruising under the chin, multiple abrasions to the back, scattered abrasions to both knees, a large scratch to the right arm, abrasions near the feet, and dried blood on the feet. Nurse [Jayme] Vecchione's gynecological examination revealed "frank" red blood, indicating active bleeding. After further investigation, she discovered one-centimeter abrasions at the "three," "six," and "nine" positions. The area under the "six" position was swollen and bruised.
>
> [Id. at 9-10.]

The State introduced photographs of Melissa's injuries and expert medical testimony indicating Melissa's nose was fractured.

As we previously noted, "Melissa told a nurse that defendant had not penetrated her. In her trial testimony, Melissa explained that at the time she said

this to the nurse, she had believed 'penetrating means when you allow the men's penis to go all the way into your vagina.'" Id. at 12. Melissa admitted at trial that she similarly told police she successfully thwarted defendant's attempts to penetrate her, explaining her confusion at the time.

Defendant testified at trial disputing Melissa's testimony, asserting the encounter with Melissa was consensual, that the two had had consensual sex in the same location a week earlier, and Melissa expressed her interest in "more than a hundred" daily text messages that were "always romantic." Id. at 13.

## B.

After we affirmed the resentencing following remand, defendant sought PCR, raising numerous claims both in self-represented submissions and supplemental filings by PCR counsel. We address only the claims relevant to defendant's appeal.

Specifically, defendant argued before the PCR court that trial counsel was ineffective because he "failed to object when [counsel] received last minute discovery from the [S]tate[,] . . . [including] the transcript of the victim's mother['s]" statement to police indicating that Melissa initially told her "she had not been raped" by defendant. The recording of the interview, conducted in Spanish, had been provided in an earlier discovery production.

The transcript reflects Melissa's mother's account of seeing her daughter return home "all bloody," recalling Melissa "let herself fall," "faint[ing]." She told police she asked her daughter, "[D]id something happen" stating, "that miserable person has done something," and Melissa said, "[M]ama, it was [defendant]." She said Melissa was crying as they proceeded to the police department and then to the hospital. Melissa's mother described helping her daughter change out of her clothes that were covered in dirt and blood. Melissa's mother informed police: "I told her, 'trust me, did he rape you,' and she told me no, so then she started to cry, so then I told her 'calm down . . . calm down . . . .'" Melissa's mother indicated she was later told the details of the investigation, recalling, "[A]nd so then she started to tell me part of what was going on and what she was saying and I was hugging her and I was telling her she was not alone."

Defendant claimed trial counsel "should have asked for additional time" upon receiving the transcript and argued "the transcript . . . . should have been shown to the jury." Defendant presented no evidence or further detail as to when or how the transcript was provided. In his PCR brief, defendant acknowledged trial counsel's brief in support of the motion for a new trial in which counsel asserted that prejudice resulted from the late discovery, but argued counsel's

challenge, although "compelling[,] . . . was clearly filed way too late," and "[r]easonably competent counsel has a duty to object to such a violation when it occurs, not weeks after the trial has ended." With respect to Melissa's mother's statement, defendant asserted that "reasonably competent trial counsel would have made this motion before or during the trial."

At oral argument before the trial court, PCR counsel explained that he spoke to trial counsel, who recalled objecting to late discovery but did not recall memorializing the objection on the record. PCR counsel argued that Melissa's statement to her mother should have been presented to the jury, and an evidentiary hearing was necessary to determine whether the failure to offer the statement or call the mother to testify was rooted in sound trial strategy or error.

The State countered that defendant "failed woefully" in showing trial counsel's performance prejudiced him, emphasizing trial counsel received discovery containing the details of the sexual assault from the nurse examiner's report "two months prior to the trial date," in which the photographs were referenced and a diagram depicted in detail Melissa's injuries as described in narrative detail within the report. Regarding Melissa's mother's statement to police, the State contended it was an inadmissible hearsay statement. The State emphasized that Melissa's denial was not inconsistent with her trial testimony

that she never had sex before and misunderstood the use of the term rape to mean full penile penetration, and, thus, initially told medical staff she had not been penetrated by defendant.

The PCR court denied defendant's petition without an evidentiary hearing by order and written decision on April 24, 2023. First, the court found "defendant[] . . . failed to overcome the strong presumption that his prior counsel was incompetent." It determined defendant failed to offer any evidence that trial counsel was deficient. The court found the recording of Melissa's mother's statement to police "was turned over in discovery[ and] would likely amount to inadmissible hearsay." Thus, the court found defendant did not make out a prima facie claim of counsel's deficient performance for ineffective assistance of counsel.

II.

Defendant argues on appeal:

POINT I

THE PCR COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO OBJECT TO THE LATE DISCOVERY OF [MELISSA'S MOTHER]'S STATEMENT TRANSCRIPT AND THE

RESULTING FAILURE TO INTRODUCE THE VICTIM'S EXCULPATORY STATEMENT AT TRIAL.

Defendant argues an evidentiary hearing was warranted to determine why counsel did not present Melissa's mother's statement at trial, claiming "if this statement had been provided to defendant in a timely manner, it [wa]s extremely likely that the result of the proceedings would have been different as this statement . . . was extremely powerful evidence for the defense." Defendant acknowledges that trial counsel unsuccessfully attempted to elicit the statement through testimony from the detective who took the statement, but asserts counsel should have either questioned Melissa about this prior statement or called Melissa's mother to testify. Defendant asserts, citing N.J.R.E. 803(a)(1), "competent . . . counsel would have known in advance of trial when questioning M[elissa] about her prior statement[,] . . . that if M[elissa] denied making [the] statement, he would be able to introduce M[elissa]'s prior inconsistent statement as an exception to the hearsay rule." Defendant claims "[t]he failure to present the prior inconsistent statement cannot be deemed a strategic choice," and the failure to present the statement warranted an evidentiary hearing to understand trial counsel's decision.

A-3042-22

The State responds and initially emphasizes "nothing in this record . . . indicate[s] late notice of [Melissa's mother]'s . . . transcript" as her "transcribed statement was turned over with all other discovery."  The State contends that even if the statement "was not sent separately, but with other discovery, [this] does not make it 'concealed[,]'[] nor is there any proof in the record to support that the transcript of [Melissa's mother]'s statement was turned over 'late.'"  The State also asserts that Melissa's mother's statement that Melissa denied being raped is inadmissible hearsay unless defendant called Melissa's mother to testify, and failure to call a likely adverse witness would have been a sound strategic call.  Moreover, the State emphasizes the lack of prejudice, as Melissa's own testimony—admitting she told others she had not been penetrated as she misunderstood the definition—placed before the jury the same information showing Melissa initially denied being raped.

## III.

When a PCR court does not hold an evidentiary hearing, this court "review[s] its legal and factual determinations de novo."  State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020).  Simply raising a claim for PCR does not entitle the defendant to an evidentiary hearing.  See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).  To obtain an evidentiary hearing a

defendant must first present a prima facie claim in support of their petition. See R. 3:22-10; see also State v. Preciose, 129 N.J. 451, 462 (1992).

"[PCR] is New Jersey's analogue to the federal writ of habeas corpus." Id. at 459. Rule 3:22-2 provides the grounds for a petition for PCR, including the "[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey."

"The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution require that a defendant receive 'the effective assistance of counsel' during a criminal proceeding." State v. Porter, 216 N.J. 343, 352 (2013). "To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate the reasonable likelihood of succeeding under the test set forth in Strickland v. Washington, 466 U.S. 668, 694 (1984)." Preciose, 129 N.J. at 463; see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland test in considering ineffective assistance claims under New Jersey's Constitution).

The Strickland two-part test evaluates "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," 466 U.S. at 686, and failure to

establish either prong requires the denial of a PCR petition founded on an ineffective assistance of counsel claim. Id. at 700. To satisfy the first prong, defendant must demonstrate counsel's performance was deficient and "fell below an objective standard of reasonableness" and "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 88.

Defendants "must allege specific facts and evidence supporting [their] allegations." Porter, 216 N.J. at 355. "Bald assertions" will not suffice. Cummings, 321 N.J. Super. at 170. Further, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action [by counsel] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "Merely because a trial strategy fails does not mean that counsel was ineffective." State v. Bey, 161 N.J. 233, 251 (1999).

Under Strickland's second prong, a defendant must "affirmatively prove" "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." State v. Gideon, 244 N.J. 538,

14

551 (2021) (quoting Strickland, 466 U.S. at 694). Prejudice "is not presumed." Fritz, 105 N.J. at 52. Errors with "some conceivable effect on the outcome" fall short of warranting relief. Strickland, 466 U.S. at 693. "Although a demonstration of prejudice constitutes the second part of the Strickland analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." State v. Gaitan, 209 N.J. 339, 350 (2012).

An evidentiary hearing need not be granted simply upon request for PCR, see Cummings, 321 N.J. Super. at 170; however, a hearing may be warranted if a defendant makes a prima facie showing of ineffective assistance and the court deems a hearing necessary to develop a sufficient factual record. See Preciose, 129 N.J. at 462.

Against this backdrop, we consider and reject defendant's claims and conclude defendant failed to establish a prima facie case of ineffective assistance of counsel. We initially note that the hearsay challenges to admitting the statement without calling Melissa's mother were evident. The court properly ruled the statement inadmissible through the detective's testimony.

15

Trial counsel could have asked Melissa directly, and if she denied making the statement, could have called Melissa's mother to testify. However, a review of Melissa's mother's transcribed statement reveals the potential peril were defendant to call this clearly adverse witness to testify for that limited purpose at trial. Melissa's mother described in vivid detail her daughter's bloody, disheveled appearance and distraught emotional state upon arriving home, and her statement suggested that, despite her daughter's initial response that she had not been raped, Melissa later came to understand what actually occurred. Thus, the significant risk of calling Melissa's mother is evident from the transcript alone, which is all defendant offered to the PCR court in support of his request for a hearing.

It certainly would not be a per se unsound strategic decision for the defense to avoid calling the victim's mother to testify in a brutal sexual assault trial such as this, given that testimony from other witnesses amply showed Melissa had contemporaneously denied being raped to police and medical workers, and Melissa admitted her denials, explaining her misunderstanding. But even were we to assume for purposes of argument that trial counsel should have been more tenacious in attempting to admit the hearsay statement as a prior inconsistent statement or through some other avenue, we are independently

satisfied that defendant did not demonstrate any arguable deficiency was prejudicial to him as required under Strickland's second prong. See Gaitan, 209 N.J. at 350.

The record contained ample evidence of defendant's forcible aggravated sexual assault, including Melissa's graphic retelling of events, medical testimony, and physical evidence. Defendant's bloody clothes were discovered upon his arrest. The record also clearly demonstrates trial counsel's vigorous cross-examination, eliciting from the State's witnesses, and importantly from Melissa, that she had denied being penetrated, as in her inexperience, she believed that meant something beyond what had occurred. We are not persuaded there is a reasonable probability that but for trial counsel's failure to present to the jury Melissa's tearful initial denial to her mother, the outcome would have been different. See Gideon, 244 N.J. at 551.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

17